Filed 9/16/20 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION[1]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RIVERSIDE COUNTY TRANSPORTATION COMMISSION, <br><br> Plaintiff, Cross-defendant and Appellant, <br><br> v. <br><br> SOUTHERN CALIFORNIA GAS COMPANY, <br><br> Defendant, Cross-complainant and Appellant. | E069462 <br><br> (Super.Ct.No. RIC1412266) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

The petition for rehearing filed on September 8, 2020 is denied. The opinion filed in this matter on August 24, 2020, is modified as follows:

1. Delete the paragraph that starts at the bottom of page 21 and ends at the top of page 22 and replace it with:

> We disagree. The dismissal with prejudice merely prevented the Commission from recovering on its breach of contract cause of action. It did not preclude it from recovering on its reimbursement cause of action, based on the Licenses.

> The Gas Company is essentially asserting that the dismissal of the first cause of action is res judicata or collateral estoppel. However, these doctrines do not apply here, because there is no final judgment. Both doctrines require a final judgment. (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986)

---

[1]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B, V and IX.D.

1

41 Cal.3d 903, 910-911 [collateral estoppel]; *Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 974 [res judicata].) Thus, normally, an order is not res judicata or collateral estoppel later in the same action. (*Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1185.) We know of only two exceptions: (1) an appealable order can be res judicata or collateral estoppel in a later phase of the same action (*In re Matthew C.* (1993) 6 Cal.4th 386, 393; *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1147); and (2) in criminal cases, as an aspect of double jeopardy, an acquittal can be collateral estoppel in a retrial in the same action (*Yeager v. United States* (2009) 557 U.S. 110, 118-123; see also *People v. Barragan* (2004) 32 Cal.4th 236, 255, fn. 7.)

In California, a judgment is not final for purposes of res judicata or collateral estoppel if an appeal is pending or could still be taken. (*Baker v. Eilers Music Co.* (1917) 175 Cal. 652, 655; *National Union Fire Ins. Co. v. Stites Prof. Law Corp.* (1991) 235 Ca1.App.3d 1718, 1726.) Even under the exceptions noted above, the prior order or ruling must be final, in the sense that it is no longer subject to appeal. (*In re Matthew C.*, *supra*, 6 Cal.4th at p. 393; *People v. Burns* (2011) 198 Cal.App.4th 726, 733.) Thus, here, there is no final judgment yet. And, by definition, if we reverse the judgment, there will still be no final judgment.

As authority to the contrary, the Gas Company cites *Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319. There, a subcontractor sued the contractor and the contractor's surety. (*Id*. at pp. 1323-1324.) The contractor cross-complained against the subcontractor, alleging, among other things, that the subcontractor breached the subcontract and negligently performed the subcontract. (*Id*. at p. 1324.) The parties reached a settlement, as to the cross-complaint only, pursuant to which the contractor dismissed its cross-complaint with prejudice in exchange for $162,500. (*Id*. at p. 1324.)

The appellate court held that the dismissal of the cross-complaint, with prejudice, barred the contractor from using the matters alleged in its cross-complaint as defenses to the complaint. (*Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America*, *supra*, 133 Cal.App.4th at pp. 1326-1334.) It reached this result as a matter of res judicata (*id*. at pp. 1327-1332) and also, alternatively, as a matter of collateral estoppel (*id*. at pp. 1332-1334).

As relevant here, the court held that the dismissal of the cross-complaint was sufficiently final for res judicata and collateral estoppel

2

purposes. It explained: "[A] retraxit — modernly effected by a plaintiff's filing of a dismissal of his or her action with prejudice — is *deemed to be a judgment on the merits* against that plaintiff. [Citations.] . . . A retraxit arising from a dismissal with prejudice thus operates as a legal fiction, and it is given the same finality as if the matter were adjudicated and proceeded to a final judgment on the merits." (*Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America*, *supra*, 133 Cal.App.4th at pp. 1330-1331; see also *id*. at p. 1333.)

This reasoning is open to question. The *Alpha Mechanical* court relied on its own opinion in *Torrey Pines Bank v. Superior Court* (1989) 216 Cal.App.3d 813. There, however, the court held that the dismissal with prejudice of a previous action — not a cross-complaint in the same action — barred the relitigation of matters alleged in that previous action. (*Id*. at pp. 817, 819-820.) It also relied on *Walsh v. West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532. *Walsh* assumed that, under *Torrey Pines*, the dismissal of a cross-complaint with prejudice could have preclusive effect in the same action; however, it held that there it did not have preclusive effect when the matters alleged in the cross-complaint were reasserted under a general denial, rather than as affirmative defenses. (*Walsh v. West Valley Mission Community College Dist.*, *supra*, at pp. 1545-1546.) Thus, neither case supported the conclusion that the dismissal of a cross-complaint is sufficiently final to have res judicata or collateral estoppel effect later in the same action.

We may assume, however, that *Alpha Mechanical* is correct, as far as it goes. Our case is significantly different, for two reasons.

First, the Commission did not dismiss its entire complaint; it merely dismissed some of its causes of action. "Pleading of alternative theories of relief on the same set of facts is, of course, quite proper . . . . [Citation.]" (*Gebert v. Yank* (1985) 172 Cal.App.3d 544, 554.) "A plaintiff who sets forth alternative remedies in separate counts in his complaint may abandon or dismiss one count without prejudice to his right to proceed on the other. [Citations.]" (*Steele v. Litton Industries, Inc.* (1968) 260 Cal.App.2d 157, 172.)

Second, the dismissal was pursuant to a settlement agreement which indicated that the dismissal was *not* intended as a retraxit. As the *Alpha Mechanical* court conceded, "parties may by agreement limit the legal effect of a dismissal with prejudice so that it would not constitute a retraxit and affect their rights in a later pending action. [Citations.]" (*Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty &*

3

*Surety Co. of America*, *supra*, 133 Cal.App.4th at p. 1334.) The settlement agreement here specifically provided that it was entered "with both [the Commission] and [the Gas Company] fully reserving (and without waiving any) of their rights to appeal with regard to the Court's prior orders and rulings and the Court's judgment . . . ." If we were to hold that the resulting dismissal of some causes of action barred the Commission from obtaining a reversal of the judgment on its other causes of action, we would be violating the settlement agreement.

2. On page 22, replace this sentence:

The only authority that the Gas Company cites in support of this argument is *Neubauer v. Goldfarb* (2003) 108 Ca1.App.4th 47.

with:

The Gas Company also cites *Neubauer v. Goldfarb* (2003) 108 Ca1.App.4th 47.

3. On page 24, at the end of footnote 11, add:

Finally, in a petition for rehearing, the Gas Company argued that, because Civil Code section 1084 was not cited below, it had no reason or opportunity to introduce evidence regarding the intent of the parties to the Purchase Agreement. But even aside from Civil Code section 1084, the intent of the contracting parties is pretty obviously relevant to the question of whether the Purchase Agreement conveyed the Licenses.

4. On page 25, replace this sentence:

We can reasonably conclude that they provided for a separate assignment and assumption agreement strictly for evidentiary and recordkeeping reasons.

with:

The only reasonable conclusion is that they provided for a separate assignment and assumption agreement strictly for evidentiary and recordkeeping reasons.

5. On page 76, replace this sentence:

The railroad may immediately seek to eject it, on the ground that, by having its workers enter the railroad's property without permission, by exposing the

railroad to liability, or by failing to comply with safety and engineering standards, the utility is interfering with its property rights.

with:

The railroad may immediately sue it for damages and injunctive relief on a trespass theory, or even attempt to eject it, on the ground that, by having its workers enter the railroad's property without permission, by exposing the railroad to liability, or by failing to comply with safety and engineering standards, the utility is interfering with its property rights.

There is no change in the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ_____
                                                                    P. J.

We concur:

CODRINGTON_____
                            J.

RAPHAEL_____
                            J.

5

Filed 8/24/20 (unmodified opinion)
See Concurring and Dissenting Opinion

CERTIFIED FOR PARTIAL PUBLICATION\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| RIVERSIDE COUNTY TRANSPORTATION COMMISSION, | E069462 |
| Plaintiff, Cross-defendant and Appellant, | (Super.Ct.No. RIC1412266) |
| v. | OPINION |
| SOUTHERN CALIFORNIA GAS COMPANY, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.

Affirmed in part, reversed in part, and remanded.

Gibson, Dunn & Crutcher, David A. Battaglia, Andrew M. Roach, and Jennifer K. Bracht for Defendant, Cross-complainant, and Appellant.

---

\*      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B, V and IX.D.

1

Best Best & Krieger, Scott W. Ditfurth, and Thomas M. O'Connell for Plaintiff, Cross-defendant, and Appellant.

Wolf Wallenstein & Abrams and Michael H. Wallenstein; Mary C. Wickham, County Counsel, and Charles M. Safer and Kathleen Dougherty, Deputy County Counsel, for Los Angeles County Metropolitan Transportation Authority; Geoffrey P. Forgione for Southern California Regional Rail Authority; and Julianna K. Tillquist for San Bernardino County Transportation Authority, as amici curiae on behalf of Plaintiff, Cross-defendant, and Appellant.

This case presents questions that have recurred at least since the 1860s (see, e.g., *Water Com'rs of Jersey City v. City of Hudson* (N.J. Ch. 1861) 13 N.J. Eq. 420), when rail lines, macadamized streets, water pipelines, sewer pipelines, gas pipelines, and soon electrical lines all began to proliferate across America: When the time comes to install or to improve any one of these modern conveniences, what is to be done about another one that stands in its way? Can one force the other to relocate? And if so, who must pay for the relocation?

Obviously, each of these cases is unique in some respects. Nevertheless, we discern a theme that runs through them: You can't stand in the way of progress.

So it is here. The Riverside County Transportation Commission (Commission) sought to extend its Metrolink commuter rail line from Riverside to Perris, using the route of a preexisting rail line that it had acquired. At five points, however, the new rail line would cross gas pipelines owned by the Southern California Gas Company (Gas

2

Company).  The Gas Company had installed these pipelines under city streets decades earlier, pursuant to franchises granted by the relevant cities and, in some instances, pursuant to licenses granted by the then-owner of the preexisting rail line.  The new rail line could not be built as long as the pipelines remained in place.

The Commission terminated the licenses and demanded that the Gas Company relocate its pipelines at its own expense.  The parties agreed that the Gas Company would relocate its pipelines, to other points also owned by the Commission, and the Commission would pay the estimated expenses, but only provisionally; the Commission could still sue for reimbursement, and the Gas Company could then sue for any additional expenses.[1]

The trial court ruled that the Gas Company had to bear all of the costs of relocation — in other words, you can't stand in the way of progress.  However, it also ruled that the Gas Company had never trespassed on the Commission's land.

Both sides appeal.  We will hold that that the Gas Company did have to bear all of the costs of relocation.  However, we will also hold that, at those points where the Gas Company held licenses for its pipelines, once the Commission terminated the licenses, the Gas Company could be held liable for trespass.

---

[1] In utility relocation cases, there is a long and honorable history of similar agreements to allow construction to proceed and to litigate the cost issue later.  (E.g., *Louisville City Ry. Co. v. City of Louisville* (1871) 71 Ky. 415, 419.)

# I

## FACTUAL BACKGROUND

A. *The Trial Court's Evidentiary Rulings*.

The facts in part I.B, *post*, are taken from the evidence admitted in connection with the parties' cross-motions for summary adjudication.

The Commission objected to some of the Gas Company's evidence. The trial court overruled all but one of these objections.

Likewise, the Gas Company objected to some of the Commission's evidence.[2] The trial court overruled all but one of these objections.

The Commission also requested judicial notice of specified documents. The trial court granted the Commission's request in part and denied it in part.

Finally, the Gas Company also requested judicial notice of specified documents. The Commission objected to the Gas Company's request. It does not appear that the trial court ever expressly ruled on this request or on the objections thereto.

Neither side contends that any of these rulings were erroneous. Moreover, neither side complains about the trial court's failure to rule. Accordingly, we consider all of this evidence, except that which the trial court excluded. (Code Civ. Proc., § 437c, subd. (c); *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.)

---

[2] Our discussion in this part does not include the Gas Company's objections to evidence that the Commission submitted with its reply, which we discuss in part V.A, *post*.

B.    *The Facts as Shown by the Record*.

The Commission is a governmental entity (see Pub. Util. Code, §§ 130000-130828.1) created by the Legislature (see *id*., §§ 130050, 130053-130053.7, 240000-240323).  It has the authority to acquire, construct, maintain, and operate public transit systems.  (See *id*., §§ 130001, 130105, subd. (f), 130259, subd. (d)).

The Gas Company is an investor-owned public utility.  It is the only entity authorized to provide natural gas in Riverside County.

1.    *The franchises*.

The City of Riverside, in 1939, and the City of Perris, in 1953, enacted ordinances granting the Gas Company franchises to lay and use pipelines under their public streets (Franchises).[3]  These ordinances were repeatedly renewed and extended thereafter.[4]  To become effective, the Franchises had to be accepted by the Gas Company, and the Gas Company had to pay annual franchise fees; thus, the Franchises were creatures not only of statute, but also of contract.

The Franchises obligate the Gas Company to "remove and relocate, without expense to the City, any facilities installed, used and maintained under this franchise if and when made necessary by any lawful change of grade, alignment or width of any

---

[3]    The parties introduced similar ordinances enacted by the County of Riverside.  However, those applied only in unincorporated areas, which are not at issue here.

[4]    The Perris ordinance expired in 1993 and, as far as the record shows, was not renewed until 2002.  However, the gap does not seem to be material.

5

public street, way, alley or place, including the construction of any subway or viaduct by the City . . . ."

2.      *The licenses*.

Between 1957 and 1979, the Atchison, Topeka and Santa Fe Railway Company and its successor in interest, the Burlington Northern and Santa Fe Railroad (collectively Santa Fe), granted the Gas Company a series of pipeline licenses (Licenses).  Each of the Licenses allowed the Gas Company to run a pipeline across Santa Fe's San Jacinto Branch Line at a specified point.

According to the recitals in the Licenses, the Gas Company paid minimal consideration for them (between $10 and $150 each).

Each of the Licenses provided:  "Licensee shall, at its own cost . . . , locate, construct and maintain the pipe line in such a manner . . . that it will not at any time be a source of danger to or interference with the present or future tracks, roadbed and property of Licensor or the safe operation of its railroad."  (Capitalization altered.)

The Licenses also provided that they "may be terminated at any time by either party upon ten (10) days' notice in writing . . . , and that upon the termination of this license in this or any other manner herein provided, Licensee, upon demand of Licensor, shall abandon the use of the pipe line and remove the same . . . ."  (Capitalization altered.)

Finally, they provided that they "shall be binding upon and inure to the benefit of the successors . . . and assigns of the parties . . . ."

6

3. *The purchase agreement and the resulting deeds.*

In 1992, Santa Fe, the Commission, and others entered into an agreement (Purchase Agreement) in which Santa Fe agreed to sell its San Jacinto Branch Line (Property) to the Commission.

The title conveyed was "subject . . . to" "all applicable laws, rules, regulations or orders of any municipality or any other governmental . . . or public authority . . . ."

The conveyance specifically included "Santa Fe's interests in all . . . licenses . . . encumbering or relating in whole or in part to any portion" of the Property. Moreover, the title conveyed was subject to all such licenses.

The Purchase Agreement provided that, before the closing, the parties would execute an assignment and assumption agreement, in which Santa Fe would convey such licenses to the Commission, and the Commission would assume Santa Fe's obligations under the licenses. However, it does not appear that any such assignment and assumption agreement was ever actually executed.

Pursuant to the Purchase Agreement, Santa Fe deeded the Property to the Commission in a series of transactions between 1993 and 2012 (Deeds).[5]

---

[5] Some portions of the Property were deeded in fee simple. Others were deeded as exclusive easements, subject only to shared use by Amtrak. However, some of the latter portions were later redeeded in fee simple. In any event, as between the Commission and the Gas Company, an exclusive easement is tantamount to a fee. (See generally *Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1600.)

Like the Purchase Agreement, the Deeds provided that the interest conveyed was "subject . . . to" "all applicable laws, rules, regulations or orders of any municipality or other governmental, statutory or public authority . . . ."

They also provided that the interest conveyed was subject to "any . . . licenses to the extent that the same do not and will not materially interfere with . . . [the Commission]'s use of the portion of the Property . . . which is used for Agency Rail Service [defined as the operation of passenger trains]."

After the closing, Santa Fe was supposed to send written notice of the conveyance to all licensees. The Gas Company claims there is evidence that this never happened. More accurately, the evidence fails to show one way or the other whether it happened.

4. *The Metrolink extension.*

In or before 2012, the Commission decided to build a 24-mile-long commuter rail line that would extend the Metrolink system from Riverside to Perris.

Due to construction requirements and/or safety requirements, the planned rail line was incompatible with the Gas Company's pipelines at five points where they intersected (conflict points):

(1) Palmyrita Avenue, between Iowa Avenue and Ardmore Street, in Riverside;

(2) Mt. Vernon Avenue, between Linden Street and East Campus View Drive, in Riverside;

(3) West San Jacinto Avenue, between North C and D Streets, in Perris;

(4) West 5th Street, between South C and D Streets, in Perris;

8

(5)  South Perris Boulevard, between State and Commercial Streets, in Perris.

All five conflict points were part of the Property that the Commission had acquired from Santa Fe.[6]

The Gas Company had Licenses from Santa Fe for four of the five conflict points. It had no license for the San Jacinto Avenue conflict point.

The Commission ordered the Gas Company to remove its pipelines from the conflict points and to relocate them, at its own expense.  The Gas Company responded that it was willing to relocate the pipelines, but only at the Commission's expense.

In November 2012, the Commission notified the Gas Company that it was terminating the Licenses.  However, the Gas Company still refused to relocate its pipelines at its own expense.  Hence, in January 2013, the Commission filed an action against the Gas Company.

In October 2013, construction of the rail line began.  In February 2014, to avoid delaying the construction, the parties entered into a settlement agreement (Settlement Agreement).  It provided that the Gas Company would relocate the pipelines at three of the conflict points and cap and abandon the other two, and the Commission would pay the Gas Company $562,155 — the then-estimated cost of doing the work — but only under protest.  The Commission reserved the right to sue for reimbursement.  The Gas

---

[6]    The Gas Company contends that there was no evidence of this, and that the trial court erred by failing to sustain its objections to the evidence of it that the Commission offered.  We will discuss this contention in part V.A, *post*.

9

Company reserved the right to counter-sue for any additional costs, but only if the Commission sued it first.

The Commission promptly paid the $562,155.

By July 2014, the Gas Company had relocated or abandoned its pipelines, as agreed. All of the new locations were in public streets, ran across the Commission's Property, and were approved by Commission and its engineers. The Commission therefore dismissed its action.

The actual cost of the relocation, however, turned out to be $1,229,737[7] — more than double the estimate.

## II

## PROCEDURAL BACKGROUND

In December 2014, the Commission filed this action. Its complaint asserted causes of action for breach of the Licenses, for reimbursement of the paid portion of the relocation costs, for trespass, to quiet title, and for declaratory relief, along with common counts.

The Gas Company filed a cross-complaint. The operative (first amended) cross-complaint asserted causes of action for inverse condemnation, breach of the Settlement Agreement, and declaratory relief. The Commission demurred to the cross-complaint. The trial court sustained the demurrer without leave to amend.

---

[7] The figures given for each of the five conflict points add up to only $1,229,369. The discrepancy, however, is not material to this appeal.

The Gas Company then filed a motion for summary judgment (or summary adjudication) on the complaint.

The Commission filed a cross-motion for summary adjudication of its first (breach of the Licenses), second (reimbursement), and seventh (trespass) causes of action.

On the Gas Company's motion, the trial court summarily adjudicated the Commission's causes of action for quiet title, trespass, and declaratory relief in favor of the Gas Company. On the Commission's motion, the trial court summarily adjudicated its cause of action for reimbursement in favor of the Commission. It denied the motions with respect to all other causes of action.

To facilitate an appeal, the parties stipulated to dismiss the Commission's remaining causes of action with prejudice. The trial court then entered a final judgment in accordance with its previous orders, awarding the Commission reimbursement of the $562,155 from the Gas Company.

Both parties have appealed. Three nonparties — the Los Angeles County Metropolitan Transportation Authority, the San Bernardino County Transportation Authority, and the Southern California Regional Rail Authority (amici) — have filed a joint amicus brief in support of the Commission.

# III

## THE STANDARD OF REVIEW

A.    *The Rulings on the Cross-Motions for Summary Adjudication.*

"A party may seek summary adjudication on whether a cause of action, affirmative defense, or punitive damages claim has merit or whether a defendant owed a duty to a plaintiff.  [Citation.]  'A motion for summary adjudication . . . shall proceed in all procedural respects as a motion for summary judgment.'  [Citation.]

"The moving party 'bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact.'  [Citation.]  To meet that burden, a plaintiff seeking summary adjudication on a cause of action must present evidence sufficient to establish every element of that cause of action. . . .  'Once the plaintiff . . . has met [its] burden, the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.'  [Citations.]

"A triable issue of material fact exists '"if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  [Citation.] . . .  [Citation.] [Citation.]'  [Citation.]

"We review de novo a trial court's ruling on a summary adjudication motion. [Citation.] . . .  '"Regardless of how the trial court reached its decision, it falls to us to examine the record de novo and independently determine whether that decision is

correct." [Citation.]' [Citations.]" (*California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 630-631, fn. omitted.)

      B.     *The Ruling on the Demurrer.*

The Gas Company contends that the trial court erred by summarily adjudicating the Commission's reimbursement cause of action in favor of the Commission. However, it also contends that the trial court erred by sustaining the demurrer to its inverse condemnation cause of action.

The underlying legal issues are identical. The Commission's reimbursement cause of action sought repayment of the *paid* portion of the relocation costs; the Gas Company's inverse condemnation cause of action sought payment of the *unpaid* portion of the relocation costs. The two claims were mirror images of each other.

We face a preliminary difficulty: Our review is *not* identical. In reviewing a ruling on a demurrer, we look at the facts alleged in the complaint, and we ask whether they were sufficient to state a cause of action. (*King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1050.) In reviewing a ruling on a motion for summary adjudication, we look at the evidence admitted in connection with the motion, and we ask whether the moving party is entitled to a judgment as a matter of law because there is no triable issue as to any material fact. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

Nevertheless, we see no need for us to crank through the issues twice, under two different standards of review. If the trial court erred by granting the motion for summary adjudication, it follows that it also erred in sustaining the demurrer, because either (1) the

Gas Company stated a cause of action for inverse condemnation, or (2) it could have amended to state such a cause of action. On the other hand, if the trial court correctly granted the motion for summary adjudication, it follows that either (1) the trial court also correctly sustained the demurrer or (2) the trial court's error in sustaining the demurrer was harmless. Accordingly, we review only the ruling on the cross-motions for summary adjudication.

IV

EXCLUSIVE JURISDICTION OF THE PUC

Ordinarily, the Public Utility Commission (PUC) has exclusive jurisdiction "[t]o determine and prescribe *the manner . . . and the terms of . . . use . . .* of each crossing of a public or publicly used road or highway by a railroad or street railroad, and of a street by a railroad or of a railroad by a street." (Pub. Util. Code, § 1202, subd. (a), italics added.)

Initially, then, we questioned whether this case falls within the PUC's exclusive jurisdiction. (See *City of Anaheim v. Pacific Bell Telephone Co.* (2004) 119 Cal.App.4th 838, 842-846 [PUC had exclusive jurisdiction to determine whether city or telephone utility had to pay to relocate overhead telephone facilities underground].) The parties did not raise or address this issue. This failure is not unreasonable, however, as it turns out the PUC does not have exclusive jurisdiction.[8]

---

[8] The amici allude to the issue but accept that the PUC does not have exclusive jurisdiction.

14

*Santa Clara Valley Transportation Authority v. Public Utilities Com.* (2004) 124 Cal.App.4th 346 held that the PUC's railroad crossing jurisdiction under Public Utilities Code section 1202 does not apply to a railroad operated by a public transit district. It explained, in part: "'In the absence of legislation otherwise providing, the [PUC]'s jurisdiction to regulate public utilities extends only to the regulation of privately owned utilities.' [Citation.]" (*Id*. at p. 363.) "'PUC jurisdiction over a transit district must be clearly provided by statute" (*id*. at p. 365), but it found no such statute. (*Id*. at pp. 364-365.) This reasoning also applies to a county transportation commission such as the Commission. (See also *Id*. at pp. 361-362, 364-365.)

V

THE COMMISSION'S TITLE TO THE CONFLICT POINTS

The Gas Company contends that the Commission failed to prove that it had title to the conflict points.

A.      *Objections to Evidence Submitted With Reply Papers*.

Before reaching this issue, we must decide a preliminary contention. With its reply papers, the Commission submitted evidence intended to show that it *did* have title to the conflict points. The Gas Company contends that the trial court erred by failing to rule on its objections to this evidence.

1.      *Additional factual and procedural background*.

As in this appeal, the Gas Company argued below that the Commission had failed to prove that it actually owned the conflict points.

15

When the Commission filed its reply, it submitted additional evidence, generally intended to prove its ownership. The Gas Company filed written objections to this evidence, on the ground that it was improper to introduce new evidence in reply. It also objected to the evidence as lacking authentication, lacking foundation, improper opinion, and hearsay.

At the hearing on the cross-motions for summary adjudication, the trial court observed, "[The Commission] did provide new evidence in the reply, and that is not proper." After hearing further argument, however, it took the Gas Company's objections under submission.

Nevertheless, when the trial court ruled on the motions, it did not rule on these objections. The Gas Company therefore filed a written request that it rule on them. It did not respond.

2. *Discussion*.

"[F]iling of written evidentiary objections before the summary judgment hearing preserve[s] them on appeal. [Citation.] After a party objects to evidence, the trial court must then rule on those objections. If the trial court fails to rule after a party has properly objected, the evidentiary objections are not deemed waived on appeal." (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 517.)

The trial court questioned whether the Gas Company's objections were timely. "Unless otherwise excused by the court on a showing of good cause, all written objections to evidence in support of or in opposition to a motion for summary judgment

16

or summary adjudication must be served and filed at the same time as the objecting party's opposition or reply papers are served and filed." (Cal. Rules of Court, rule 3.1354(a).) Here, however, the Gas Company showed good cause — it could hardly object to evidence in the Commission's reply papers before those papers had yet been filed. Moreover, the trial court eventually ruled that it would "consider the objections on the merits." Finally, in the alternative to filing written objections, the Gas Company had the option of objecting orally at the hearing. (Cal. Rules of Court, rule 3.1351(b).) Its counsel did so, incorporating the written objections by reference. This is an appropriate way of objecting. (*Reid v. Google, Inc.*, *supra*, 50 Cal.4th at p. 522.)

"Generally, a party moving for summary judgment may not rely on new evidence filed with its reply papers. [Citation.]" (*Moore v. William Jessup University* (2015) 243 Cal.App.4th 427, 432, fn. 3.) "Where a remedy as drastic as summary judgment is involved, due process requires a party be fully advised of the issues to be addressed and be given adequate notice of what facts it must rebut in order to prevail. [Citation.]" (*San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002) 102 Cal.App.4th 308, 316.) "'[T]he inclusion of additional evidentiary matter with the reply should only be allowed in the exceptional case . . .' and if permitted, the other party should be given the opportunity to respond. [Citations.]" (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537-1538.)

It follows that the trial court should have sustained the Gas Company's objections to the new evidence (or, at a minimum, should have given it an opportunity to respond to

17

the evidence).  It is hard to tell, however, whether the Gas Company has been prejudiced, because the record does not show whether the trial court ever actually considered or relied on this evidence.

As discussed in part III, *ante*, our review is de novo.  Accordingly, when we turn to the Gas Company's argument that that the Commission failed to prove that it had title to the conflict points (see part V.B, *post*), we will ignore the new reply evidence.  This is a sufficient appellate remedy.

B.     *Evidence That the Commission Owned the Conflict Points.*

1.     *Additional factual and procedural background.*

In response to interrogatories asking it to "[s]tate every fact" supporting its contention that it owned the conflict points, the Commission pointed to the Deeds from Santa Fe.

The Deeds designated the property being conveyed (1) as the "San Jacinto Line", (2) by legal description and (3) in two instances, also by assessor's parcel number (APN).

With a few exceptions not relevant here, the legal descriptions referred to each parcel in terms of a specified number of feet "on each side of the centerline of the former main track of the Atchison, Topeka and Santa Fe Railway Company's property," from one specified milepost to another specified milepost.[9]

---

[9]     For example, parcel 2 was described as:  "A 200 foot wide strip of land in the City of Riverside, lying in section 18, township 2 south, range 4 west, San Bernardino base and meridian, being *100 feet on each side of the centerline of the main track of the Atchison, Topeka and Santa Fe Railway Company's property* lying in said railway's San Jacinto Subdivision, *beginning from said railway's mile post 1.50* (being the centerline of

Mark Lancaster, the Commission's Right-of-Way Manager, was deposed as its "person most qualified." (See Code Civ. Proc., § 2025.230.) He testified that he could not tell, just by looking at the Deeds, whether they included the conflict points. He did not know the APN of any of the conflict points. He believed he could "figure it out," though not just by looking at the Deeds.

In a declaration, however, Lancaster testified that the Commission "is currently the owner in fee of the entire San Jacinto branch line . . . ."

2.       *Discussion*.

The Deeds established that Santa Fe conveyed to the Commission the main track of its San Jacinto Subdivision, running continuously[10] from milepost 0.30 (in Riverside) through milepost 38.33 (in San Jacinto).

The Licenses established the locations of four of the conflict points:

Palmyrita (in Riverside): Milepost 0 + 4375 (i.e., 0.828 miles), which would put it in Parcel 1 as conveyed by the Deeds.

---

Marlborough Street) being also the north line of the southeast quarter of said section 18, *to said railway's mile post 2.02* (being the centerline of Spruce Street) being the south line of said section 18." (Italics added; capitalization altered.)

**10**       Continuous, that is, with one exception: The portion from milepost 26.93 to milepost 27.00 was omitted. This appears to have been a mere typographical error. Parcel 41 was described as the portion from milepost 23.31 to milepost 26.93. *Both* parcel 42 *and* parcel 43 were then described as the portion from milepost 27.00 to milepost 27.96. It seems pretty obvious that parcel 42 was intended to be the portion from milepost 26.93 to milepost 27.00.

Even assuming this portion was never actually conveyed, however, it did not include any of the conflict points.

Mt. Vernon (in Riverside):  Milepost 3 + 2121 (i.e., 3.401 miles), which would put it in Parcel 4 as conveyed by the Deeds.

West Fifth (in Perris):  Milepost 18 + 2190 (i.e., 18.415 miles), which would put it in Parcel 33 as conveyed by the Deeds.

South Perris (in Perris):  Milepost 19 + 1988 (i.e., 19.377 miles), which would put it in Parcel 38 as conveyed by the Deeds.

Because the Commission's Property included a continuous length of trackway running from milepost 0.30 to milepost 38.33, there was uncontradicted evidence that the Commission owned each of these four conflict points.

The Gas Company did not have a license for the West San Jacinto conflict point. As a result, there was no document showing its location with reference to a milepost. Maps, however, established that it lay in Perris, just a few blocks north of the West Fifth conflict point.  Again, because the Commission owned a continuous length of trackway from one end of Perris to the other, this was sufficient to show that it also owned this conflict point.

VI

THE LICENSES

The trial court ruled that the Commission had no rights under the Licenses because Santa Fe had never assigned them to the Commission:  "I see nothing that transferred the actual license[s] to the [Commission]. . . .  [The Commission] has not shown to this

Court's satisfaction that it is in fact a successor or assign of the [L]icenses."  The Commission contends that this was error.

A.  *The Voluntary Dismissal of the Commission's Cause of Action*

*for Breach of the Licenses*.

The Gas Company responds, among other things, that this contention is procedurally barred.  The first cause of action in the Commission's complaint was for breach of contract; it alleged that the Gas Company had breached the Licenses by refusing to relocate its pipelines at its own cost.  The trial court denied the Commission's motion for summary judgment on this cause of action; it accepted the Gas Company's argument that the Deeds conveyed the Property to the Commission, but not the Licenses.  By stipulation, to facilitate an appeal, the Commission then dismissed its first cause of action with prejudice.  The Gas Company concludes that the Commission cannot rely on the Licenses in this appeal.

We disagree.  The dismissal with prejudice merely prevented the Commission from recovering on its breach of contract cause of action.  It did not preclude it from recovering on its reimbursement cause of action, *based on* the Licenses.  The Gas Company is essentially asserting that the dismissal of the first cause of action is res judicata or collateral estoppel.  However, these doctrines do not apply here, because there is no final judgment.  In California, a judgment is not final for purposes of res judicata or collateral estoppel if an appeal is pending or could still be taken.  (*Baker v. Eilers Music Co.* (1917) 175 Cal. 652, 655; *National Union Fire Ins. Co. v. Stites Prof. Law Corp.*

21

(1991) 235 Cal.App.3d 1718, 1726.)  And, by definition, if we reverse the judgment, there will be no final judgment.  The effect of the dismissal with prejudice is the same as if it occurred while the remainder of the case was still pending at the trial court level.

The only authority that the Gas Company cites in support of this argument is *Neubauer v. Goldfarb* (2003) 108 Cal.App.4th 47.  There, the plaintiffs (collectively Neubauer) were asserting a breach of contract cause of action; the trial court denied leave to amend to add a breach of fiduciary duty cause of action.  (*Id*. at p. 51.)  The parties entered into a settlement agreement:  the defendants paid $100,000; the plaintiffs dismissed their breach of contract action with prejudice, but reserved the right to appeal the denial of leave to add a breach of fiduciary duty cause of action.  (*Id*. at p. 53.)

The appellate court declined to consider the denial of leave to add the fiduciary duty cause of action.  (*Neubauer v. Goldfarb*, *supra*, 108 Cal.App.4th at pp. 53-54.)  It noted that the plaintiffs had admitted that the two causes of action "'seek redress for the *same* injury.'"  (*Id*. at p. 53.)  It concluded:  "Thus, by his own admission, Neubauer has been fully compensated for the injury to the primary right in issue.  Regardless of the number of legal theories Neubauer might be able to plead, he is entitled to only one recovery for the violation of one primary right."  (*Id*. at pp. 53-54.)

In other words, *Neubauer* is based on the rule against double recovery (and perhaps implicitly on mootness).  Here, by contrast, the Commission's dismissal of its breach of contract did not fully compensate it for its claimed injury.  In fact, the situation here was almost the opposite of the situation in *Neubauer*:  The trial court had granted

22

summary judgment in favor of the Commission on its reimbursement cause of action; thus, the Commission had been fully compensated (subject to review on appeal), and had no reason to continue to pursue its cause of action for breach of the Licenses. Its reimbursement cause of action is not moot, and there is no threat of a double recovery.

B.      *The Merits.*

"[A] license does not run with the land to bind a subsequent purchaser." (53 C.J.R. (2017) Licenses, § 149, fn. omitted; accord, *Rowan v. Riley* (2003) 139 Idaho 49, 56.) Ordinarily, "a conveyance of the property burdened with a license revokes the license . . . ." (6 Miller & Starr, Cal. Real Estate (4th ed. 2016) § 15:2, pp. 15-9 to 15-10, fn. omitted; see, e.g., *Rau v. Collins* (2006) 167 Md.App. 176, 192-193 [891 A.2d 1175, 1184].) However, a license can be "made assignable by contract." (28 Cal.Jur.3d (2012) Easements and Licenses, § 97; accord, Rest. Property, § 517 ["A license is assignable in so far as it was intended in its creation to be assignable."]; see also Bruce & Ely, The Law of Easements & Licenses in Land (2011) § 11:4.) Here, the Licenses provided that they would be binding on successors and assigns.

The Gas Company reasons that, because a license does not run with the land, the Licenses had to be assigned separately and expressly; the mere conveyance of the land was insufficient to assign the Licenses. The trial court evidently accepted this argument.

In the amici's view, this was error. They cite Civil Code section 1084 (section 1084), which provides: "The transfer of a thing transfers also all its incidents, unless

23

expressly excepted . . . ." They conclude that the conveyance of the Property was sufficient to convey the Licenses.[11]

We agree. "In the absence of a contrary intention on the part of the grantor, everything essential to the beneficial use and enjoyment of the property conveyed is considered as passing to the grantee, either as part thereof or as appurtenant thereto. [Citation.]" (*Boring v. Filby* (1957) 151 Cal.App.2d 602, 605.) Here, the right, under the Licenses, to compel the Gas Company to remove its pipelines was reasonably essential to the beneficial use and enjoyment of the property conveyed.

Admittedly, the Purchase Agreement provided that the Property and the Licenses were to be conveyed by separate documents — the Property by a deed, and the Licenses

---

[11] The Gas Company was entitled to file a response to the amicus brief (Cal. Rules of Court, rule 8.200(c)(6)), and did. In that response, it briefly dismissed amici's argument based on Civil Code section 1084 as "overreaching."

After we sent out our tentative opinion (see Ct. App., Fourth Dist., Div. Two, Internal Operating Practices & Proc., VIII, Tentative opinions and oral argument), however, the Gas Company objected to our consideration of amici's argument, because it was raised for the first time on appeal (*RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1518 ["Appellate courts will generally not consider new theories raised for the first time on appeal. [Citation.]"]), and because it was raised by amici (*People v. Hannon* (2016) 5 Cal.App.5th 94, 105 ["Courts generally do not consider new issues raised in amicus briefs."]). This objection — after the Gas Company had already had an opportunity to respond, and *had* responded, on the merits — came too late. (*C&C Construction, Inc. v. Sacramento Municipal Utility Dist.* (2004) 122 Cal.App.4th 284, 303.)

In any event, amici's argument was not truly new. The parties have litigated, hotly, both here and below, the issue of whether the conveyance of the Property also conveyed the Licenses. All the amici added was a citation to Civil Code section 1084. The mere citation of a case, statute, or other authority that was not cited below does not necessarily raise a new issue. To the contrary, it can be squarely within the role of an amicus.

24

by an assignment and assumption agreement. It could therefore be argued that the Purchase Agreement "expressly excepted" the Licenses from passing with the property under section 1084.

This argument, however, is flawed. In interpreting a contract, the mutual intention of the parties is controlling. (Civ. Code, § 1636.) The parties to the Purchase Agreement — Santa Fe and the Commission — had no reason to *prevent* the Licenses from transferring with the Property. To the contrary, they wanted to ensure that the Commission got what it paid for (and that Santa Fe was relieved of any further duties or liabilities under the Licenses). We can reasonably conclude that they provided for a separate assignment and assumption agreement strictly for evidentiary and record-keeping reasons. Whatever their actual intention was, however, it was *not* to except the Licenses from the operation of section 1084.

The Gas Company argues that the Licenses were "expressly excepted" from section 1084 for a different reason: Supposedly the Deeds carved out the Licenses from the title being conveyed. Not so. They provided that the title conveyed was "subject . . . to" "any . . . licenses . . . ." This meant that the Commission would be bound by the Licenses, in that it could not abrogate the licensees' rights. It follows, however, that it would also have the benefit of the Licenses. Accordingly, far from providing that licenses were *not* conveyed to the Commission, the "subject to" language essentially provided that they *were* conveyed to the Commission.

25

In any event, even assuming the Deeds alone were insufficient to convey Santa Fe's rights under the Licenses to the Commission, we still conclude that the Commission can exercise those rights, for two separate and alternative reasons.

First, the Gas Company lacks standing to challenge the assignment. The Purchase Agreement required an assignment of the Licenses. Under the "further cooperation" provision, the Commission could demand, to this day, that Santa Fe complete the assignment. As a result, the purported assignment is, at most, voidable rather than void. "[A] voidable . . . assignment is one that the parties to it may ratify and thereby give it legal force and effect or extinguish at their election. [Citation.] Only the parties to the agreement have the power to ratify or extinguish; consequently, allowing a [third party] to challenge an assignment based on a defect that only renders it voidable would allow the [third party] to exercise rights belonging exclusively to the parties to the assignment." (*Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 811.)

Second, while the Licenses did not run with the land — meaning that they could not bind the Commission without its consent — the Commission could ratify them. "The purpose of the rule that a license is generally revoked by a conveyance of the land is to protect the marketability of titles. Since the protection is only for the benefit of the new landowner, only he can invoke it. [Citation.]" (*Chicago & North Western Transp. Co. v.*

*City of Winthrop* (Minn. 1977) 257 N.W.2d 302, 304.) Here, the Commission ratified the

Licenses by accepting their benefits — specifically, their termination provisions.**12**

The Gas Company complains that Santa Fe never gave it written notice of the

assignment, as the Purchase Agreement required. However, the Purchase Agreement did

not give the Gas Company a right to written notice; the Purchase Agreement specifically

provided that it had no third-party beneficiaries. And the Gas Company did eventually

get notice that the Licenses had been assigned — when the Commission terminated them.

The Gas Company also argues that the Commission cannot rely on the Licenses

because it terminated them, which means they are no longer in effect. This argument is

frivolous.

A contract can terminate in some respects yet survive in others. (E.g., *Ajida*

*Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 547 [arbitration

clause survived termination of contract]; *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 598

[attorney's lien rights survived termination of attorney-client contract].) "Parties to a

contract may provide therein for their respective rights and liabilities in the event of

termination thereof. [Citations.]" (*Gilbert v. Equitable Life Ins. Co. of Iowa* (1966) 239

---

**12**    This is not the typical dispute over whether a new owner of land is a successor to a license. Ordinarily, the licensee is trying to enforce its license to use the land against the new owner, and the new owner is trying to avoid being bound by the license. Here, however, the Gas Company claims that the Franchises gave it the right to use the land, independent of the Licenses. Thus, the Commission is trying to enforce the *termination provisions* of the Licenses, and the Gas Company is trying to avoid being bound by the Licenses.

Cal.App.2d 895, 899; accord, *Merrill v. Continental Assur. Co.* (1962) 200 Cal.App.2d 663, 670.)

Here, the Licenses specifically provided that "upon termination of this license . . . , Licensee, upon demand of Licensor, shall abandon the use of the pipe line and remove the same . . . ." (Capitalization altered.) Accordingly, the Gas Company's contractual duty to remove its pipelines survived the termination.[13]

Finally, the Gas Company also contends that the Licenses are irrelevant, because it already had the right under the Franchises to run its pipelines across the Commission's Property. We discuss this issue in part VII.B.4, *post*.

For these reasons, we conclude that the Commission was entitled to enforce the Licenses against the Gas Company.

---

[13] The Gas Company argues that "the [L]icenses do not . . . address the relocation of pipelines and associated expenses . . . ." They do require the *removal* of the pipelines. Because they require removal after the Licenses have otherwise been terminated, and because they do not provide for any compensation for the removal, they necessarily require the Gas Company to remove the pipelines at its own expense.

We do not understand the Gas Company to be arguing that it is entitled to compensation for *relocation* (even though it is not entitled to compensation for *removal*); that would be silly. It was not required to relocate them at all. If it did relocate them, it did so for its own benefit and thus at its own expense.

28

# VII

# TRESPASS

The Commission contends that the trial court erred by summarily adjudicating its cause of action for trespass in favor of the Gas Company in reliance on *Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301.

A.     *Additional Factual and Procedural Background*.

The trespass cause of action was based on three separate alleged trespasses:

1. Occupying the San Jacinto conflict point without a license.

2. Occupying the other four conflict points after the Commission terminated the Licenses.

3. Relocating the pipelines from the conflict points to other locations that were also on the Commission's Property.

In its motion for summary judgment, the Gas Company argued that the trespass cause of action failed because, under *Bello*, "a property holder must yield to the use of the public street by public utilities . . . ."

In its opposition, and in its own cross-motion for summary judgment, the Commission argued that: (1) *Bello* did not apply to a public entity landowner; (2) *Bello* did not apply to railroad property; and (3) the Licenses modified whatever rights the Gas Company had under *Bello*.

29

The trial court ruled, "I agree with [the Gas Company] that the *Bello* case applies." It therefore granted summary adjudication in favor of the Gas Company on the trespass cause of action.

B.      *Discussion*.

1.      <u>*Bello*</u>.

*Bello* is the leading authority in California concerning the scope of a local government's power to allow a utility to use the local government's right-of-way over a third party's land.

In *Bello*, a county road ran, in a public right-of-way, across the plaintiffs' property. The county gave a private gas company an encroachment permit, authorizing it to run its pipelines through the county's right-of-way, and thus over the plaintiffs' property. The plaintiffs sued the gas company for trespass. (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 306.)

After a bench trial, the trial court found the gas company liable for trespass (although it awarded only nominal damages). It reasoned that use for a gas pipeline was not incidental to the original road purpose of the public right-of-way. (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at pp. 306-307.)

The court of appeal reversed. As background, it discussed two seemingly conflicting lines of California Supreme Court authority. (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at pp. 307-308, 312.)

30

On one hand, in *Gurnsey v. Northern California Power Co.* (1911) 160 Cal. 699, the Supreme Court ruled for the landowner. *Gurnsey* involved the defendant's installation of electric lines in a rural county right-of-way — a "'public wagon road'" — that crossed the plaintiff's ranch. (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 310.) There, the Supreme Court held that, "[b]ecause the defendant's power lines served no transit-related function," they were not "'incident'" to the public right-of-way. (*Ibid.*)

On the other hand, in *Montgomery v. Santa Ana W. R. Co.* (1894) 104 Cal. 186, the Supreme Court ruled for the utility; it held "that a municipality could grant a private company the right to construct and operate a railroad in a public right-of-way without the landowner's consent." (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 308.)

According to *Bello*, "[T]he [*Montgomery*] court . . . summed up the basis for its holding in three words: 'The world moves . . . . [¶] The trend of judicial opinion . . . is to a broader and more comprehensive view of the rights of the public in and to the streets and highways of city and country . . . .' [Citation.]" (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 309.) *Montgomery* noted a "'wide distinction'" between a city street and a country highway; "while country roads were used only for surface transit, '[i]n the case of streets in a city there are other and further uses, such as the construction of sewers and drains, laying of gas and water pipes, erection of telegraph and telephone wires, and a variety of other improvements, beneath, upon, and above the surface, to which in modern times urban streets have been subjected.' [Citation.]" (*Ibid.*)

31

The *Bello* court concluded that *Gurnsey* is limited to roads "used solely for private surface transportation" in "'sparsely inhabited'" areas, which lack "the extensive infrastructure that accompanies modern development." (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 312.)  Everywhere else, under *Montgomery*, "as a result of the demands of urbanization, public rights-of-way located in developed areas are subject to a wide range of 'other and further uses' besides surface transportation, including the installation of sewage, water, gas, and communications lines.  [Citations.]"  (*Id*. at p. 307; see also *id*. at p. 308.)  Even in "[r]ural Solano County," "the rights-of-way in the countryside [are] as filled with the transmission hardware of public services as were city rights-of-way in the time of *Montgomery* . . . ."  (*Id*. at pp. 312-313.)

*Bello* recognized that a municipality's power to let a utility use its right-of-way over private land is not unlimited.  It declared that "a proposed use of a public right-of-way should:  (1) serve as a means, or be incident to a means, for the transport or transmission of people, commodities, waste products or information, or serve public safety [citations]; (2) serve either the public interest or a private interest of the underlying landowner that does not interfere with the public's use rights [citation]; and (3) not unduly endanger or interfere with use of the [fee owner's] property.  [Citation.]"  (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at pp. 315-316.)

Applying these three criteria to the case before it, the court found that the "pipeline serves precisely the public interest that rights-of-way were intended to promote: efficient and effective travel and transportation of goods."  (*Bello v. ABA Energy Corp.*,

32

*supra*, 121 Cal.App.4th at p. 316.)  Also, there was "no evidence that the pipeline presented any significant risk of danger or interference with use of [the plaintiffs'] property."  (*Id*. at p. 317.)  Accordingly, "[t]here [wa]s no basis for finding an abuse of discretion in the issuance of an encroachment permit to [the gas company]."  (*Ibid*.; see also *id*. at p. 320.)

### 2. *The Commission's arguments regarding* <u>Bello</u>.

The Commission argues that *Bello* does not apply here, for three reasons.

#### a. <u>Bello</u> *does not apply to land owned by a public entity*.

First, the Commission argues that the plaintiffs in *Bello* were private landowners, whereas here the Commission is a public entity.  The gist of this argument is:  (1) *Bello* allowed a utility to obtain a prescriptive easement over private property, and (2) adverse possession (including prescription) does not run against a public entity such as the Commission.  (Civ. Code, § 1007.)

But *Bello* did not involve a prescriptive easement.  The plaintiffs there argued that the utility had not been able to produce a copy of the original grant of the right-of-way, and therefore there was no evidence of its intended scope.  (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at pp. 317-318.)  As the court noted, however, the plaintiffs had conceded that a right-of-way for purposes of a public highway existed.  (*Id*. at p. 317.)  The court observed that a right-of-way can be created by an express grant, which may describe the scope in general terms, or by prescription, in which case there is no description of the scope; either way, the scope would be construed as being for public

33

highway purposes. It concluded that it *did not matter* how the right-of-way was created. (*Id*. at pp. 317-318.)

Here, much as in *Bello*, there was no evidence as to how the street rights-of-way were originally created. The Commission argued below that they had never been expressly dedicated. The trial court nevertheless ruled that rights-of-way for public street purposes did exist: "An implied dedication arises when the evidence supports an intent to dedicate without the presence of a solemn act. [¶] Here, the maps and surveys demonstrate that the intersections in question and streets existed at least by 1953." It also noted that the Commission had conceded, in its separate statement, that the streets were public. In this appeal, the Commission does not challenge this ruling.[14]

Finally, the Gas Company is not asserting a prescriptive easement. It is asserting a right, under the Franchises, to run its pipelines through public rights-of-way. Unlike either adverse possession or prescription, this assertion has nothing to do with the passage of time; rather, it piggybacks on the cities' superior rights.

        b.      *Applying <u>Bello</u> here would effect*

                *a taking without compensation*.

Second, the Commission argues that applying *Bello* here would conflict with eminent domain law. It claims that the trial court essentially allowed a taking without

---

[14]    We do not understand the Commission to be arguing that a public entity cannot make an implied dedication. While prescription and an implied dedication resemble each other in some ways, they are not the same thing. (See *Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29, 39 [analogies between implied dedication and prescription "can be misleading."].)

34

compensation. It also notes that the Gas Company has the power of eminent domain. (Pub. Util. Code, § 615.)[15] It concludes that, under the trial court's ruling, "any entity . . . now has the ability to take . . . property owned by any other entity . . . without providing just compensation so long as it abuts a public right-of-way."

The whole point of *Bello*, however, is that there was no taking. The County already had a right-of-way; *Bello* held that this included the right to allow use by a utility. The landowner, conversely, did not have a property right to exclude the utility (unless the utility violated the three *Bello* criteria, which *Bello* held it did not). While *Bello* did not explicitly discuss the constitutional aspects of its decision, it did note that cases on which it relied had allowed the installation of a utility without "compensation." (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at pp. 311, 313.) And *Montgomery*, on which *Bello* relied, was quite explicit about the fact that its holding meant that no compensation was required. (*Montgomery v. Santa Ana W. R. Co.*, *supra*, 104 Cal. at pp. 190-192.)

Moreover, in light of the three *Bello* criteria, it is just not true that *Bello* lets any entity take any other entity's property without compensation. If the proposed use (1) is not incident to transport or public safety, (2) does not serve the public interest, or (3) unduly endangers or interferes with the use of the landowner's property, then it exceeds the proper scope of the public right-of-way and does require compensation.

---

[15] As the Gas Company points out, the Commission, too, has the power of eminent domain (Pub. Util. Code, § 130220.5), and it could have condemned the pipelines — though this would have necessitated compensation.

35

c.    *Applying <u>Bello</u> here would conflict with license law.*

Third, the Commission argues that applying *Bello* here would conflict with the law regarding licenses:  "One, the Trial Court's interpretation would make it unclear why any entity would enter into a license agreement where a public right-of-way was involved.  Two, the Trial Court's interpretation would have the effect of commingling the foundational difference between a license and easement in that a license involving a public utility could no longer be revoked.  Three, the Trial Court's interpretation would have the effect of negating every license agreement that any entity has entered into that may be related to a public right-of-way."

*Bello* does mean that a utility can install some facilities in a public right-of-way without a license from the landowner.  However, this does not upend the law regarding licenses; it merely clarifies when a license is needed.  The utility and the landowner might well choose to enter into a license anyway — e.g., to prevent the landowner from claiming that the installation of the utility exceeds the three *Bello* criteria, or to provide for individualized terms regarding access or maintenance.  Moreover, as we will hold in more detail in part VII.B.4, *post*, once such a license has been entered into, a later ruling that the license was not actually necessary under *Bello* does not nullify the license, provided there was good consideration.

3.    *The amici's arguments regarding <u>Bello</u>.*

The amici additionally argue that *Bello* does not apply here, essentially because the Property is owned by a railroad.

36

a.      *Bello does not apply because a street easement across land owned by a railroad does not include subsurface rights.*

First, they argue that *Bello* involved a public right-of-way across a private person's land, which is different from a public right-of-way across a railroad's land. When a municipality runs a street across a private owner's property, the owner is deprived of all private use of the street — both the surface and the subsurface. Hence, if the municipality lets a utility run pipelines through the subsurface, the owner can hardly complain. By contrast, the amici argue, when a municipality puts a street across a railroad's property, as a matter of law, it acquires only a right to use the surface. They conclude that a railroad retains the right to exclude a utility's pipeline from the subsurface.

The cases that they cite do not support this proposition.

In *Chicago, B. & Q.R. Co. v. City of Chicago* (1897) 166 U.S. 226, a city condemned "certain parcels of land owned by individuals, and also certain parts of [a railroad's] right of way," for the purpose of extending a street. (*Id*. at p. 230.) The Supreme Court upheld an award to the railroad of only nominal damages. (*Id*. at pp. 232-233, 247-251.)

The court noted that, under Illinois state law, "when a city . . . extends a street across railroad tracks or right of way, 'it does not condemn the land of the railroad company nor prevent the use of the tracks and right of way.' [Citation.]" (*Chicago, B. & Q.R. Co. v. City of Chicago*, *supra*, 166 U.S. at p. 248.) "The land as such was not taken,

37

the railroad company was not prevented from using it, and its use for all the purposes for which it was held by the railroad company was interfered with only so far as its exclusive enjoyment for purposes of railroad tracks was diminished in value by subjecting the land within the crossing to public use as a street." (*Ibid.*)

The court also stated: "The [railroad] must be deemed to have laid its tracks within the corporate limits of the city subject to the condition — not, it is true, expressed, but necessarily implied — that new streets of the city might be opened and extended from time to time across its tracks, as the public convenience required . . . ." (*Chicago, B. & Q.R. Co. v. City of Chicago*, *supra*, 166 U.S. at p. 252.) We call this implied condition the "common law rule"; we will discuss it in more detail in part VIII, *post*.

Finally, the court noted that other owners whose property had also been taken had been awarded the full value of their property. (*Chicago, B. & Q.R. Co. v. City of Chicago*, *supra*, 166 U.S. at p. 257; see also *id*. at p. 260 [conc. & dis. opn. of Brewer, J.].) However, it held that this did not violate equal protection, because "[i]n the case of individual owners, they were deprived of the entire use and enjoyment of their property, while the railroad company was left in the possession and use of its property for the purposes for which it was being used, and for which it was best adapted, subject only to the right of the public to have a street across it." (*Id*. at p. 258.)

In sum, then, *Chicago* does not support the proposition that, when property is taken for street purposes, railroads retain subsurface rights, whereas other owners do not. Quite the contrary, the distinctions the Supreme Court drew were that the railroad, unlike

38

other owners, (1) could continue to use its property for its current purpose, and (2) was subject to the common law rule. These distinctions have nothing to do with the difference between surface and subsurface use.

In *City of Oakland v. Schenck* (1925) 197 Cal. 456, the California Supreme Court similarly upheld an award of only nominal damages for a city's taking of a street easement across a railroad right-of-way. (*Id*. at pp. 460-462.) It, too, relied on the common law rule: "[B]ecause of the nature of the interest in the land which is acquired by a city, where a street is opened across a railroad right-of-way, the rule as to the amount of compensation to be allowed the railroad company is different from the rule which prevails in the case of the taking of the property of an individual for like uses. The reason for this difference is that one of the incidents of the public use to which a railroad company dedicates its property used as a right-of-way is the right of the public to construct street crossings wherever and whenever reasonably necessary." (*Id*. at p. 460.) The court also noted that the city was seeking only an easement, not a fee; moreover, the parties had stipulated that the two uses were compatible and could coexist. (*Id*. at p. 461.) It concluded that the railroads, "as owners of the fee in the right of way over which the street is opened, will retain their rights in the soil for all purposes which are consistent with the full enjoyment of the easement for street purposes acquired by the city. [Citations.]" (*Id*. at pp. 461-462.)

We understand this use of the word "soil" to be a poetic word for property, not a reference to subsurface rights. The court distinguished between railroads and other

property owners based on the common law rule, not based on any supposed difference in subsurface rights. Certainly it did not hold that, when a street easement is taken, railroads retain subsurface rights, while other property owners do not. To the contrary, it implied that the city *could* obtain "rights in the soil," if and when necessary for "the full enjoyment of the easement for street purposes." As in *Chicago*, the core of the opinion was that, unlike other owners, the railroad (1) could continue to use its property for its current purpose, and (2) was subject to the common law rule.

Finally, the amici cite *City of San Jose v. Union Pacific Railroad Co.* (2010) 185 Cal.App.4th 624. There, a city condemned easements for street purposes across certain land belonging to a railroad. (*Id*. at p. 627.) The parties stipulated that use as a street would not interfere with use as a railroad. (*Ibid*.) The court held that the railroad was entitled to the full value of the land that it was not using for railroad purposes, but only nominal damages for the land that it was using for railroad purposes. (*Id*. at pp. 628, 634-635.)

The court explained that it was bound to follow *Schenck*, and that *Schenck* was not distinguishable. (*City of San Jose v. Union Pacific Railroad Co.*, *supra*, 185 Cal.App.4th at pp. 630-633.) It added: "[*Schenck*] rested on the constitutional concept of reasonable compensation as applied to the unique circumstances presented when a public road must cross railroad tracks: (1) the railroad's land is not taken as such; (2) the railroad's use of the land is not prevented; and (3) the land's value is diminished only to the extent that the railroad's exclusive use becomes shared with a public use. [Citation.] *Schenck* made this

40

point . . . by explaining that the rule as to the amount of compensation to be allowed a railroad company for a public crossing is different from the ordinary rule because one of the incidents of the public use to which a railroad company dedicates its property used as a right of way is the right of the public to construct street crossings wherever and whenever reasonably necessary." (*Id*. at pp. 631-632.)

In sum, then, these cases do not stand for the proposition that a street easement across railroad property does not include a right to use the subsurface. They do not discuss subsurface rights at all. Rather, they rest on the common law rule and on the fact that the railroad can still use its property as a railroad.

Moreover, *Bello* did not turn on whether the owner still had subsurface rights. Rather than adopt a hard and fast rule that a utility can *always* use *any* portion of the owner's property — or can *never* use any portion that the owner is already using — *Bello* took a flexible, fact-specific approach: The utility's use must "serve . . . the public interest" and must not "not unduly endanger or interfere with use of the [fee owner's] property." (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 316; see also *id*. at p. 320.) If a railroad — or any other landowner — still has subsurface rights, that can be considered in determining whether the utility's proposed use would unduly interfere with the landowner's use of its property.

b. *Bello does not apply because the Franchises were invalid —*

*they violated the PUC's exclusive jurisdiction.*

Second, the amici argue that, when the pipelines were first installed, Santa Fe owned the Property, and hence the PUC had exclusive jurisdiction over the conflict points. (Pub. Util. Code, § 1202, subd. (a).) (See part IV, *ante*.) They cite article XII, section 8 of the California Constitution, which states, "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the [PUC]." They conclude that the Franchises were invalid to the extent that they allowed the Gas Company to run pipelines across Santa Fe's Property.[16]

Article XII, section 8 of the California Constitution, however, goes on to state: "This section does not affect . . . the right of any city to grant franchises for public utilities . . . ." The cities therefore had the right to grant franchises in their public streets without regard to the PUC's exclusive railroad crossing jurisdiction.

Amici claim this conclusion is at odds with *Pacific Tel. & Tel. Co. v. City of Los Angeles* (1955) 44 Cal.2d 272. However, they are misreading that case.

There, the court held that a telephone company did not need a city franchise to operate in areas added to the city (by annexation or consolidation) after 1905. That was because, in 1905, a statute went into effect providing that telephone companies are

---

[16] Actually, when at least some of the pipelines were built, article XII, section 8 of the California Constitution did not yet exist; it was added in 1974. However, its predecessor provision was the same in all relevant respects. (Cal. Const., former art. XII, § 23.)

42

franchised by the state. (*Id*. at pp. 276-277, 279.) Moreover, the state's power under this statute was exclusive: "The authority to grant a franchise to engage in the telephone business resides in the state, and the city is without power to require a telephone company to obtain such a franchise unless the right to do so has been delegated to it by the state. [Citations.] The business of supplying the people with telephone service is not a municipal affair; it is a matter of statewide concern. [Citations.]" (*Id*. at pp. 279-280.)

The court considered what is now article XII, section 8. It held, however, that the wording on which we rely — "This section does not affect . . . the right of any city to grant franchises for public utilities" — did not restore cities' power to grant telephone franchises. It stated: "Th[is] proviso does not confer any rights; it merely reserves to a city such power over franchises as may have been vested in it." (*Id*. at p. 281.)

In amici's view, railroads are "a matter of statewide concern" within the exclusive jurisdiction of the PUC, and therefore immune from city franchises. *Pacific Tel. & Tel.*, however, was based on a specific statute, which took away the power of cities to grant a *telephone* franchise; it held that article XII, section 8 did not restore that power. Here, the cities have, and have had all along, the power to grant a *gas* franchise. As the court said in *Pacific Tel. & Tel.*, article XII, section 8 preserves this vested power of the cities and excepts it from whatever exclusive jurisdiction the PUC might otherwise have.

        c.       *Applying <u>Bello</u> here would lead to an absurdity*.

Finally, in a footnote, amici argue: "Allowing municipal utility franchises to apply to railroad property would lead to an absurdity. The PUC has 'the exclusive power

43

to alter, relocate, or abolish by physical closing any railroad crossing' and thus close a street entirely.  [Citations.]  Upon the closing of the street, any franchise right therein would terminate, leaving the utility in trespass over the private railroad property.  [Citation.]  Accordingly, . . . even if a franchise could give some supplementary right in the railroad/street intersection vis à vis the city, that right is ineffective against the railroad's property rights."

This conclusion does not follow from its supposed premises.  Yes, when Santa Fe owned the Property, the PUC could have closed off any street that ran across the Property, if it deemed it necessary to do so for safety purposes.  (*Union City v. Southern Pac. Co.* (1968) 261 Cal.App.2d 277, 280.)  And, arguably, at that point, any utility that had been using the street pursuant to a franchise would lose the right to do so; if Santa Fe demanded that it remove its pipeline, it would have to comply.  But that does not mean that Santa Fe could eject the utility on its own, without any action by the PUC.

In sum, then, we conclude that *Bello* is fully applicable to this dispute, even though the Commission is a railroad.

4.     *Application of Bello here*.

Here, the Gas Company installed its pipelines pursuant to a municipal franchise, rather than an encroachment permit, as in *Bello*.  However, this is a distinction without a difference; what counts is that it installed them in a public right-of-way, with the permission of the public entity.  Hence, under *Bello*, it was entitled to do so, without the

44

permission of Santa Fe or of the Commission, provided the installation met the *Bello* criteria.

With regard to the first alleged trespass, at the San Jacinto conflict point, *Bello* means there simply was no trespass at all. The City of Perris held a street right-of-way over Santa Fe's Property. Under *Bello*, it could allow the Gas Company to install a pipeline in its right-of-way, without the permission of Santa Fe or of the Commission. This installation met the *Bello* criteria: The pipeline was a means for transporting a commodity; in doing so, it served the public interest; and for decades, it did not unduly endanger or interfere with the use of the Property for railroad purposes.[17]

We turn, then to the second alleged trespass, at the other four conflict points. Interestingly, *Bello* means that, in hindsight, the Gas Company did not really need *any* licenses to maintain its pipelines at *any* of the conflict points.

Nevertheless, at the time, the law on this point was by no means clear. (See *Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 307 [discussing seemingly conflicting lines of Supreme Court authority].) The Gas Company and Santa Fe could reasonably choose to obviate any dispute by entering into the licenses. (See *R.J. Cardinal Co. v. Ritchie* (1963) 218 Cal.App.2d 124, 146, fn. 13 ["[t]he relinquishment of [a] doubtful and

---

[17] What if a pipeline is placed across private property, pursuant to *Bello*, but later the landowner wants to make a new or more intensive use of its property that is inconsistent with the pipeline? *Bello* does not speak to this situation.

We need not decide this question, because we will hold that the Commission, as a public entity, had the right to make the Gas Company remove its pipeline at its own expense. (See part VIII, *post*.)

45

disputed right or claim, if believed in good faith to exist, and not wholly void, . . . constitute[s] adequate consideration . . . ."].)  And once they did, as between the Gas Company and Santa Fe, the Licenses became controlling; they superseded the Gas Company's rights under the Franchises.  (The curious outcome is that the Gas Company has a *better* claim to the conflict point at which it had *no* license.)

After the Commission terminated the Licenses, the Gas Company's failure to relocate its pipelines within a reasonable time could be a trespass.  This means the trial court erred by summarily adjudicating the trespass cause of action as a whole.

Finally, the third alleged trespass — the relocation of the pipelines to other points on the Commission's Property — could also be a trespass.  There was evidence that the Commission did not consent to this.  Admittedly, the Settlement Agreement specified the new locations and recited that the Commission had approved them.  However, it also provided that, by entering into the Settlement Agreement, the Commission was not waiving its right to assert that the Gas Company needed licenses for the new locations. On remand, it will be open to the Gas Company to argue that it has the right, under *Bello*, to use those locations without the Commission's permission.  However, it will also be open to the Commission to argue that the Gas Company's use of those locations would unduly endanger or interfere with its use of the property.

We therefore conclude that there is a triable issue of fact as to whether the Gas Company committed trespass at the four conflict points for which it held Licenses, after the Licenses were terminated, and at the new locations.

# VIII

## THE COMMON LAW RULE

The trial court granted summary adjudication in favor of the Commission on its claim for reimbursement. It explained: "At common law, when a public utility . . . accepts franchise rights in public streets, it assumes an implied obligation to pay for relocation of its facilities when necessary to make way for a proper governmental use." It added: "This common law rule is codified in P[ublic] U[tilities] C[ode] section 6297."

The Gas Company contends that this was erroneous, for multiple reasons that we will outline below.

Preliminarily, however, we must explain why we have to decide this issue at all. We held in part VII.B.4, *ante*, that with respect to four out of the five conflict points, the Licenses are controlling. The Licenses provided that the Commission could terminate them on 10 days' notice, and upon termination, the Gas Company had to remove its pipeline at its own expense. Thus, our holding obviates this issue — except as to the San Jacinto conflict point, where the Gas Company had no license. As we also held, the Gas Company occupied the San Jacinto conflict point by right, under the Franchises.

Accordingly — if only with respect to this one conflict point — we must decide whether the trial court correctly ruled that the Commission could require the Gas Company to relocate at its own expense.

47

A.	*The Content of the Common Law Rule*.

"A franchise is a privilege conferred upon an individual or a corporation for use of a sovereign body's property.  [Citation.]"  (*Southern Pacific Pipe Lines, Inc. v. City of Long Beach* (1988) 204 Cal.App.3d 660, 666.)

Public Utilities Code section 6202 authorizes a municipality to "grant a franchise to any person, firm, or corporation . . . to use, or to lay and use, pipes and appurtenances for transmitting and distributing gas . . . under, along, across, or upon the public streets, ways, alleys, and places within the municipality . . . ."  (See also Gov. Code, § 39732, subd. (b) [city may "[g]rant franchises for the construction of public utilities it deems proper," including "the laying of gas and water pipes in public streets."].)

"[F]ranchises have been created when a governmental agency authorizes private companies to set up their infrastructures on public property in order to provide public utilities to the public; i.e., when railroad, gas, water, telephone, or electric companies set up tracks, pipes, poles, etc. across the streets and other public ways of a city. [Citations.]"  (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 703-704

"'[A] private utility's franchise in a public street is property created by contract[.]' [Citation.]"  (*Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, 218.) As property, a franchise cannot be taken for public use without compensation.  (*Willcox v. Consolidated Gas Co. of New York* (1909) 212 U.S. 19, 44; *Southern California Gas Co. v. City of Los Angeles* (1958) 50 Cal.2d 713, 716.)

48

Nevertheless, "[i]n the absence of a provision to the contrary it has generally been held that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets." (*Southern California Gas Co. v. City of Los Angeles*, *supra*, 50 Cal.2d at p. 716, and cases cited; see also *Norfolk Redev. & Housing Auth. v. C. & P. Tel. Co.* (1983) 464 U.S. 30, 35.) We will refer to this as the "common law rule."

Here, the Franchises were granted by the City of Riverside and the City of Perris. The Commission — a third governmental entity, which is not a grantor of the Franchises — is asserting an overriding governmental use. However, it has been held that the common law rule applies in this circumstance. (*Los Angeles County F.C. Dist. v. Southern Cal. Ed. Co.* (1958) 51 Cal.2d 331, 334-337 [flood control district could require utility that held franchises from various cities to relocate its equipment at its own expense to make way for storm drains]; *Southern California Gas Co. v. City of Los Angeles*, *supra*, 50 Cal.2d at pp. 717-720 [city could require utility that held franchise from the county to relocate its equipment at its own expense].)

Three distinct (though interrelated) rationales for the common law rule have been stated:

1. A franchise does not give a utility a vested right to use any particular location. (*Columbus Gaslight & Coke Co. v. City of Columbus* (1893) 50 Ohio St. 65, 69 [33 N.E.

49

292, 293]; *Boston Water Power Co. v. Boston & W.R.R. Corp.* (1839) 40 Mass. 360, 391-393.)

2.  The public entity's intended use of the streets that necessitates the relocation is an exercise of the "police power" (or the "legislative power"). This power cannot be contracted away, in the franchise agreement or otherwise. (*Columbus Gaslight & Coke Co. v. City of Columbus*, *supra*, 50 Ohio St. at pp. 68-69 [33 N.E. at p. 293] ["legislative power"]; *Roanoke Gas Co. v. City of Roanoke* (1892) 88 Va. 810 [14 S.E. 665, 666-668]; *Louisville City Ry. Co. v. City of Louisville* (1871) 71 Ky. 415, 420-422.)

3.  Requiring compensation would hamstring the public entity's ability to respond to changing conditions. (*Northern Pac. Ry. Co. v. State of Minn.* (1908) 208 U.S. 583, 596; *Chicago, B. & Q. Ry. Co. v. People of State of Illinois* (1906) 200 U.S. 561, 587, 589-590; *Columbus Gaslight & Coke Co. v. City of Columbus*, *supra*, 50 Ohio St. at p. 68 [33 N.E. at p. 293].)[18]

---

**18**     One explanation sometimes given for the common law rule is that the public's use of the streets is "paramount," whereas the utility's use is "subordinate." (E.g., *Southern California Gas Co. v. City of Los Angeles, supra,* 50 Cal.2d at p. 717; *Brunswick Gaslight Co. v. Brunswick Village Corp.* (1899) 92 Me. 493 [43 A. 104, 105]; *City of San Antonio v. San Antonio St. Ry. Co.* (Tex. Civ. App. 1896) 15 Tex.Civ.App. 1, 7-8 [39 S.W. 136, 138].) To us, this is merely a restatement of the rule, not a justification for it.

It is also said that, by accepting the franchise, the utility has impliedly agreed to pay relocation costs. (E.g., *Southern California Gas Co. v. City of Los Angeles*, *supra*, 50 Cal.2d at p. 716; *Columbus Gaslight & Coke Co. v. City of Columbus*, *supra*, 50 Ohio St. at p. 70 [33 N.E. at p. 294].) This is a legal fiction — a mandatory rule cloaked in voluntary garb.

B.      *Public Utilities Code Section 6297.*

In California, Public Utilities Code section 6297 (section 6297) provides: "The grantee [of a franchise] shall remove or relocate without expense to the municipality any facilities installed, used, and maintained under the franchise if and when made necessary by any lawful change of grade, alignment, or width of any public street, way, alley, or place, including the construction of any subway or viaduct, by the municipality."

It has been said that "[s]ection 6297 codifies the common law rule[] . . . ." (*Pasadena Metro Blue Line Construction Authority v. Pacific Bell Telephone Co.* (2006) 140 Cal.App.4th 658, 664.) Nevertheless, it differs from the common law rule in several respects. In particular, it requires the utility to pay for a relocation only "when made necessary by any lawful change of grade, alignment, or width of any public street, way, alley, or place, including the construction of any subway or viaduct, by the municipality . . . ." By contrast, the common law rule applies when a relocation is necessary for *any* "proper governmental purpose." Also, as discussed, it applies when the relocation is requested by *any* public entity, not just a municipality, and not just the original grantor of the franchise.

Here, the trial court relied on both the common law rule and on section 6297. The Gas Company contends that section 6297 did not apply. We agree. The Commission is not a municipality. The Public Utilities Code does not define "municipality"; however, it does state, "As used in this chapter, municipality includes counties . . . ." (Pub. Util. Code, § 6201.5.) If the definition included anything so recherché as a county

51

transportation commission, one would expect it to so provide. Thus, section 6297, which is part of the same chapter, is limited to cities and counties.

A fortiori, the Commission is not "*the* municipality" that granted the franchise. And it did not demand relocation due to a "change of grade, alignment, or width of a[] public street."**19**

The question, then, is whether the enactment of section 6297 implicitly limited or abolished the common law rule. In *Los Angeles County F.C. Dist. v. Southern Cal. Ed. Co.*, *supra*, 51 Cal.2d 331, our Supreme Court acknowledged that section 6297 "may" differ from the common law rule. (*Id*. at p. 338.) It held, however, that section 6297 does not replace the common law rule; rather, the two operate in tandem: "[T]he enumeration of what were considered to be the most important of the utilities' obligations cannot reasonably be interpreted as an 'express direction of the Legislature' passing the utilities' other common-law obligations over to the tax-payer." (*Id*. at pp. 338-339; accord, *City of Livermore v. Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1410, 1413-1414.)

---

**19** The Commission accuses the Gas Company of deliberately omitting the fact that section 6297 also refers to a "subway." Because the statute refers to a "subway" in the same breath as a "viaduct," we believe it uses "subway" in the sense of an undercarry, not in the sense of an underground railway. In any event, the Commission was seeking to build an overground railway, not a subway. And finally, the statute actually refers to a "lawful change of grade, alignment, or width of any public street . . . , *including* the construction of a[] subway . . . ." (Italics added.) If the Commission was building a subway at all, it was not doing so as part of a change of grade, alignment, or width of a public street.

C.    *The Introduction of the Governmental-Proprietary Distinction into the*

      *Utility Relocation Context*.

As mentioned, the common law rule, as ordinarily phrased, requires a franchised utility to "to make way for a *proper governmental use* of the streets." (*Southern California Gas Co. v. City of Los Angeles*, *supra*, 50 Cal.2d at p. 716, italics added.) This tees up the question: Was the Commission's construction of a Metrolink extension a proper governmental use?

According to the Gas Company, it was not, because it was "proprietary," rather than "governmental." The trial court ruled that a governmental-proprietary distinction in the utility relocation context has been "rejected." The Gas Company contends that this was error. However, we agree with the trial court.

This issue requires a historical approach, beginning with *New Orleans Gaslight Co. v. Drainage Commission of New Orleans* (1905) 197 U.S. 453, 459-462. There, a public entity's installation of a drainage system required the relocation of some of a gas company's pipelines, for which it held a franchise from the state legislature. (*Id*. at p. 453.) The United States Supreme Court held that the common law rule does not effect a taking without compensation, in violation of due process. (*Id*. at pp. 458-461.) It relied on the three rationales listed above. First, "[t]here was nothing in the grant of the [franchise] which gave the company the right to any particular location in the streets . . . ." (*Id*. at p. 459.) Second, "[t]he drainage of a city in the interest of the public health and welfare is one of the most important purposes for which the police power can be

53

exercised." (*Id*. at p. 460.)  "The police power, in so far as its exercise is essential to the health of the community, it has been held cannot be contracted away" (*ibid*.), and "uncompensated obedience to a regulation enacted for the public safety under the police power of the state [i]s not taking property without due compensation."  (*Id*. at p. 462.)  Third, "whatever right the gas company acquired was subject, in so far as the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare."  (*Id*. at p. 461.)

In *City of Los Angeles v. Los Angeles Gas & Electric Corp.* (1919) 251 U.S. 32, however, the Supreme Court threw a monkey wrench into the constitutionality of the common law rule by making it depend on the governmental-proprietary distinction.

There, a city granted a utility a franchise to place its lighting system in certain streets.  (*City of Los Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at p. 33.)  About four months before the franchise was due to expire (see *id*., at pp. 34-35), the city adopted an ordinance requiring the utility to remove or relocate its equipment so the city could install its own lighting system.  (*Id*. at pp. 34-35.)

The city argued that it had "the right to displace other systems as an exercise of the police power . . . ."  (*City of Los Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at p. 37.)  The utility responded that its franchise rights were "not . . . free from reasonable regulation, if such regulation is governmental, but free from molestation or displacement to make 'space' for a city system, for that is proprietary."  (*Id*. at p. 38.)

The Supreme Court stated: "[T]he only question is whether the city may as matter of public right and without compensation clear a 'space' for the instrumentalities of its system by removing or relocating the instrumentalities of other systems." (*City of Los Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at p. 37.) It held that the answer was "No." (*Id*. at pp. 39-40.) Its explanation — though short and hardly a model of clarity — stated two reasons.

First, the city was acting in its "proprietary" capacity rather than its "governmental" capacity. (*City of Los Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at pp. 38-39.) "The difference in the capacities is recognized and the difference in attendant powers pointed out in decisions of this court. [Citations.]" (*Ibid*.) The court approved the trial court's finding that the utility's electrical system did not "imperil[]" "the public health, peace or safety." (*Id*. at p. 38.) It concluded that "we are not concerned with the duty of the corporation operating a public utility to yield uncompensated obedience to a police measure adopted for the protection of the public . . . ." (*Id*. at p. 40.)

Second, the city was essentially taking the entire franchise. The court stated: "A franchise conveys rights and if their exercise could be prevented or destroyed by a simple declaration of a municipal council, they would be infirm indeed in tenure and substance." (*City of Los Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at p. 39.)

Just two years later, in *Postal Telegraph-Cable Co. v. City and County of San Francisco* (1921) 53 Cal.App. 188, a California court of appeal held in a utility relocation

55

case that the proprietary-governmental distinction was controlling, citing *Los Angeles*. There, San Francisco demanded that a telegraph utility relocate its manholes from Market Street, between Geary Street and Van Ness Avenue, at its own expense, to make way for an extension of the city's street railway system. (*Id*. at p. 190.)

Preliminarily, the court held that, in operating the street railway, the city was acting in a proprietary capacity. (*Postal Telegraph-Cable Co. v. City and County of San Francisco*, *supra*, 53 Cal.App. at pp. 190-191.) It then concluded that it was "unable to distinguish this case from . . . *Los Angeles* . . . ." (*Id*. at p. 191.) "The occupation and use of said street . . . did not, of course, give [the utility] the right to lay its conduits or establish and maintain their approaches in such a manner as would interfere with the normal and ordinary uses of the street for purposes of travel and traffic; but it was, nevertheless, a valuable and vested right, and the property used therein a valuable property, which the city, in the exercise of the purely proprietary activity of constructing and maintaining a municipal railway system upon and along said street, could not interfere with or destroy without being subjected to the same rightful demand for compensation which a private corporation engaging in a like enterprise would be required to respond to under the law of eminent domain." (*Id*. at pp. 192-193.)

The California Supreme Court has never squarely held that the governmental-proprietary distinction is (or is not) controlling in the utility relocation context. However, in *Southern California Gas Co. v. City of Los Angeles*, *supra*, 50 Cal.2d 713, the court at least assumed that it was. There, the court held that a utility was required to relocate its

equipment at its own expense from a strip of land where it interfered with the construction of a sewer. In so doing, the court said: "[It] has generally been held that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets. [Citations.] *The laying of sewers is a governmental as distinct from a proprietary function* under the foregoing rule. [Citations.]" (*Id*. at pp. 716-717, italics added.)

D.      The *History of the Governmental-Proprietary Distinction*.

The distinction between a public entity's governmental capacity and its proprietary capacity has a long history. Many different courts have used it in many different contexts. Even if we limit our survey to the United States Supreme Court, that court has used it to decide issues involving:

1.  State impairment of municipal contracts. (*City of Worcester v. Worcester Consol. St. Ry. Co.* (1905) 196 U.S. 539, 548-553.)

2.  State immunity from federal taxation. (*State of South Carolina v. United States* (1905) 199 U.S. 437, 461.)

3.  State immunity from federal regulation under the Tenth Amendment. (*National League of Cities v. Usery* (1976) 426 U.S. 833, 852.)

4.  State and local governmental immunity from tort liability. (*Harris v. District of Columbia* (1921) 256 U.S. 650, 652; see also *People v. Superior Court of City and County of San Francisco* (1947) 29 Cal.2d 754, 761-762.)

57

5. Sovereign immunity of a foreign sovereign. (*Alfred Dunhill of London, Inc. v. Republic of Cuba* (1976) 425 U.S. 682, 702-706.)

6. The application of the dormant commerce clause to a state. (*Reeves, Inc. v. Stake* (1980) 447 U.S. 429, 436.)

7. The constitutional rights of government employees. (*Engquist v. Oregon Dept. of Agr.* (2008) 553 U.S. 591, 598-599.)

Over time, however, the United States Supreme Court has abandoned the distinction in a number of these contexts.

At an early date, in *City of Trenton v. State of New Jersey* (1923) 262 U.S. 182, it abandoned the distinction in the context of state impairment of municipal contracts. (*Id.* at pp. 191-192.) It observed: "The basis of the distinction is difficult to state, and there is no established rule for the determination of what belongs to the one or the other class." (*Ibid.*)

Next, in *State of New York v. United States* (1946) 326 U.S. 572, the court abandoned the distinction in the context of state immunity from federal taxation.[20] It

---

[20] Two justices joined the lead opinion. (*State of New York v. United States*, *supra*, 326 U.S. at pp. 573-574 [lead opn. of Frankfurter, J., joined by Rutledge, J.], pp. 584-586 [conc. opn. of Rutledge, J.].) Four concurred in the result only. (*Id.* at pp. 586-590 [conc. opn. of Stone, J., joined by Reed, Murphy, and Burton, J.].) Two dissented (*id.* at pp. 590-598 [dis. opn. of Douglas, J., joined by Black, J.]), and one did not participate. (*Id.* at p. 584 [Jackson, J.].) All of the participating justices, however, expressed at least some dissatisfaction with the governmental-proprietary distinction. Thus, the Supreme Court later characterized the case as holding "*unanimously* . . . that the distinction between 'governmental' and 'proprietary' functions was 'untenable' and must be abandoned." (*Garcia v. San Antonio Metropolitan Transit Authority* (1985) 469 U.S. 528, 542, italics added.)

dismissed it as "steril[e]" and "not . . . a satisfactory guide." (*Id*. at p. 580.) "To rest the

federal taxing power on what is 'normally' conducted by private enterprise in

contradiction to the 'usual' governmental functions is too shifting a basis for determining

constitutional power and too entangled in expediency to serve as a dependable legal

criterion." (*Ibid*.)

In *Indian Towing Co. v. United States* (1955) 350 U.S. 61, the court refused to

adopt the distinction in the context of federal tort immunity, even though the Tort Claims

Act contained language that could plausibly be read to support it. (*Id*. at pp. 65-68.) It

described the distinction as a "quagmire that has long plagued the law of municipal

corporations." (*Id*. at p. 65.) It added that state cases applying the distinction "are

disharmonious and disclose the inevitable chaos when courts try to apply a rule of law

that is inherently unsound."[21] (*Id*. at p. 65.) It concluded that "all Government activity is

inescapably 'uniquely governmental' in that it is performed by the Government." (*Id*. at

p. 67.)

And in *Garcia v. San Antonio Metropolitan Transit Authority*, *supra*, 469 U.S.

528, the court abandoned the distinction in the context of state immunity from federal

regulation under the Tenth Amendment. (*Id*. at pp. 537-547.) After citing *New York*, it

---

[21]    In *Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211, the California
Supreme Court completely abrogated state and local governmental immunity to tort
liability, regardless of whether the underlying activity is governmental or proprietary.
Thereafter, the Legislature adopted the Government Claims Act (Gov. Code, § 800 et
seq.), which reinstated governmental tort immunity, under specified circumstances, but
did not reenact the governmental-proprietary distinction.

added, "The distinction the Court discarded as unworkable in the field of tax immunity has proved no more fruitful in the field of regulatory immunity under the Commerce Clause." (*Id.* at pp. 542-543.) It described the distinction as "[un]stable," "uncertain[]" (*id.* at p. 542), "unworkable" (*id.* at p. 543) and lacking any "organizing principle." (*Id.* at p. 539.)

This does not mean the governmental-proprietary distinction is defunct. It does mean, however, that the tide of the distinction "was once . . . at the full," "but now [we] only hear its melancholy, long, withdrawing roar, retreating . . . ." (M. Arnold, Dover Beach (1867).)

Leaving aside *Postal Telegraph*, which we have already discussed, the Gas Company string-cites no fewer than 18 cases as recognizing that governmental water systems, hospitals, golf courses, airports, ports, and, in one instance, railways, are proprietary.[22] Many of these cases, however, are obsolete. For example, it is hardly

---

[22]     *Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1190; *County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 163, fn. 7; *Marin Water & Power Co. v. Town of Sausalito* (1914) 168 Cal. 587, 594-595; *City of South Pasadena v. Pasadena Land & Water Co.* (1908) 152 Cal. 579, 593; *City of San Buenaventura v. United Water Conservation Dist.* (2015) 235 Cal.App.4th 220, 250, aff'd in part, rev'd in part (2017) 3 Cal.5th 1191; *Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 334-342 [state rail system is proprietary for purposes of federal preemption]; *Associated General Contractors of America v. San Diego Unified School Dist.* (2011) 195 Cal.App.4th 748, 757; *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1777; *Glenbrook Development Co. v. City of Brea* (1967) 253 Cal.App.2d 267, 274 [Fourth Dist., Div. Two]; *Plaza v. City of San Mateo* (1954) 123 Cal.App.2d 103, 112; *Hession v. City and County of San Francisco* (1954) 122 Cal.App.2d 592, 600 [city rail system is proprietary for purposes of local governmental tort immunity]; *Beard v. City and County of San Francisco* (1947) 79 Cal.App.2d 753,

surprising that, back in the era when municipal tort immunity still turned on the governmental-proprietary distinction, there were cases holding certain municipal activities to be proprietary. Most important, none of these cases involved utility relocation.

E.       *The Governmental-Proprietary Distinction in the Utility Relocation Context*.

This brings us to the key question: Is the governmental-proprietary distinction still good law in the utility relocation context?

*Northeast Sacramento Co. Sant. Dist. v. Northridge Park Co. Wtr. Dist.* (1966) 247 Cal.App.2d 317 opined that it was not. It labeled the distinction "unexplained and inexplicable." (*Id*. at p. 324) It relied on the fact that "the distinction had been born" in the "field" of "governmental immunity from liability in torts," but later "had been abandoned" in that same field. (*Id*. at p. 325.) It concluded: "To maintain the '[g]overnmental versus proprietary function' as a test in the determination of relocation cost allocation is . . . specious. . . . '[W]hatever local government is authorized to do

_____

758; *Ravettino v. City of San Diego* (1945) 70 Cal.App.2d 37, 47-48; *Coleman v. City of Oakland* (1930) 110 Cal.App. 715, 720; *Nourse v. City of Los Angeles* (1914) 25 Cal.App. 384, 385; *Air Transport Ass'n of America v. City and County of San Francisco* (1998) 992 F.Supp. 1149, 1159, aff'd and remanded (2001) 266 F.3d 1064; *United States v. Certain Parcels of Land in Los Angeles County* (1945) 63 F.Supp. 175, 184.)

*People ex rel. City of Downey v. Downey County Water Dist.* (1962) 202 Cal.App.2d 786, which the Gas Company also cites, actually says, "While a municipality acts in a proprietary capacity in supplying water [citation], *the cases* [in the relevant context] *fail to make any distinction between governmental and proprietary functions* . . . ." (*Id*. at p. 793, italics added.)

61

constitutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur.'" (*Ibid*.)

*Northeast*, however, did not cite or discuss the United States Supreme Court's decision in *Los Angeles*.

In the more than 50 years since *Northeast*, as far as we have been able to tell, no California case has considered whether the governmental-proprietary distinction applies in the context of utility relocation.

In *Pacific Tel. & Tel. Co. v. Redevelopment Agency* (1977) 75 Cal.App.3d 957, a utility relocation case, this court did question the continuing validity of the distinction. We said: "'The distinction between "governmental function" and "proprietary function" is a sort of abstraction difficult to make meaningful in a day when municipalities continually find new ways to exercise police power in their efforts to cope with the pressing needs of their citizens.' [Citation.] A utility's right to compensation should depend, not on whether municipal activity is 'governmental' or 'proprietary,' but on whether compensation has been required by the Legislature, or whether there has been a constitutionally compensable taking or damaging of a valuable property right." (*Id*. at p. 968.) We did not decide the question, however, because we held that, even if the distinction applied, the particular public entity activity that required the relocation — urban redevelopment — was governmental. (*Id*. at pp. 969-970.)

Some of our sister-state courts, however, have come to the same conclusion as *Northeast*.

In *Northwest Natural Gas Co. v. City of Portland* (1985) 300 Or. 291 [711 P.2d 119], the Supreme Court of Oregon refused to apply the governmental-proprietary distinction in the utility relocation context. (*Id.* at pp. 297-302.) Rather, it held that "utilities must bear the expense of utility relocation when such relocation is required to accommodate a public work. [Citations.]" (*Id.* at p. 306.)

It stated: "Utility relocation cases categorize municipal activities as governmental or proprietary without helpful analysis. The results are mixed, perhaps chaotic. [Citations.] . . . Some courts have held that municipally operated mass transit, water, lighting, and power utilities were proprietary. [Citations.] However, other courts have held similar activities to be governmental. [Citation.]" (*Northwest Natural Gas Co. v. City of Portland*, *supra*, 300 Or. at p. 299, fn. omitted.)

The court cited *Los Angeles* as supporting the governmental-proprietary distinction (*Northwest Natural Gas Co. v. City of Portland*, *supra*, 300 Or. at p. 297); evidently, however, it did not feel constrained to follow it. Rather, it cited *Garcia* for the proposition that the distinction is "unworkable." (*Id.* at pp. 301-302.)

In *City and County of Denver v. Mountain States Tel. and Tel. Co.* (Colo. 1988) 754 P.2d 1172, the Supreme Court of Colorado held: "[T]he governmental/proprietary distinction is no longer cognizable in the utilities relocation context . . . ." (*Id.* at p. 1176.) Instead, the applicable rule is that "a municipality may compel public utilities to relocate their facilities from the public right-of-way at their own cost whenever such

63

relocation is necessitated by the municipality's reasonable exercise of police power to regulate the health, safety, or welfare of its citizens." (*Id*. at p. 1176.)

It explained: "We [have] rejected the governmental/proprietary distinction in the municipal zoning context because it did not provide a fair or predictable means of determining which municipal functions are governmental and which functions are proprietary. [Citation.] This problem is also present in the utilities relocation context. [Citations.] In addition to being an unreliable means of distinguishing exercises of municipal authority, the governmental/proprietary distinction is analytically unsound because it assumes that functions which were once relegated to the private sector could not later be undertaken by municipalities in support of the health, safety and welfare of its citizens." (*City and County of Denver v. Mountain States Tel. and Tel. Co*., *supra*, 754 P.2d at p. 1175.)

In *Vermont Gas Systems, Inc. v. City of Burlington* (1989) 153 Vt. 210 [571 A.2d 45], the Vermont Supreme Court held "that the governmental/proprietary distinction has no applicability in the area of utilities relocation law." (*Id*. at p. 215.) In its place, it held that a utility must pay to relocate its equipment to make way for "public improvements whenever and wherever the public interests demand." (*Ibid*.)

It explained: "Although courts generally fail to analyze the 'basis for the distinctions between governmental and proprietary activities,' those that do 'seem to assert that governmental and proprietary functions are distinguishable based on whether the public bodies are engaged in activity that is (1) essential or necessary for the

government to perform, or (2) traditional for the government to perform.' [Citation.]

Both of these tests, however, have proven unworkable. In general, when courts utilize

the 'essential or necessary' mode of analysis, nearly all municipal activities are deemed

governmental rather than proprietary. [Citations.] Likewise, the 'traditional function'

test is often based on outmoded ideas. For example, while mass transit systems were

generally operated by private industry at the turn of this century, due to economic

necessity, by the mid-1960's many mass transit systems were publicly operated.

[Citation.]" (*Vermont Gas Systems, Inc. v. City of Burlington*, *supra*, 153 Vt. at p. 213.)

"[T]his distinction has lead [*sic*] to inconsistent results in other jurisdictions and it

is simply not necessary in this context. Utilities voluntarily enter into transactions with

municipalities and, as a result, have protections available to them that are not ordinarily

available to tort victims. In the first instance, the utilities can bargain with the

municipalities to allocate the risk, by contract, for just this type of event. Further,

municipalities must still 'act constitutionally, within applicable statutes, and within the

authority of their charters and ordinances.' [Citation.] Finally, the utility can adjust its

rates to reflect the costs of relocation." (*Vermont Gas Systems, Inc. v. City of Burlington*,

*supra*, 153 Vt. at p. 214.)

Most recently, in *City of Taylor v. Detroit Edison Co.* (2006) 475 Mich. 109 [715

N.W.2d 28], the Michigan Supreme Court said: "While many Michigan Court of

Appeals cases have applied the '[governmental-proprietary distinction],' there is no

support for it in either our statutes or Constitution. . . . We overrule the Court of Appeals

cases that apply the proprietary function/governmental function test in this area of the law." (*Id*. at pp. 120-121, fns. omitted.) It looked instead to whether the public entity was acting within its statutory authority.

Some states may still apply the governmental-proprietary distinction, at least in some contexts. The Gas Company has cited state cases that did apply it (though none more recent than 1977). Still, like our sister court in *Northeast*, and like the sister-state courts listed above, we are convinced that the governmental-proprietary distinction does not make sense, at least in the utility location context. Unlike them, however we do not feel free to jettison the distinction unless we can reconcile our action with *Los Angeles* — a holding by the United States Supreme Court, based on the federal constitution.

We believe *Postal Telegraph-Cable* (and similar cases in other states) misread *Los Angeles*. As discussed, the reasoning in *Los Angeles* had two prongs: (1) the city was acting in its proprietary capacity rather than its governmental capacity; and (2) the city was essentially trying to take the entire franchise. *Postal Telegraph-Cable* treated these as disjunctive, alternative reasons. Thus, it held that, when a public entity is acting in its proprietary capacity, it cannot require a franchised utility to pay to relocate *any* of its equipment.

This reading of *Los Angeles* is unsound. As *New Orleans* observed, a utility's franchise does not give it a property right to any particular location. Thus, it would make no sense for *Los Angeles* to hold that a public entity would have to compensate a utility for relocating its equipment from a few particular locations, merely because the public

66

entity happens to be acting in its proprietary capacity.  And at the time, under *New Orleans*, if a public entity was exercising its police powers — which *Los Angeles* treated as a synonym for acting in a governmental capacity — due process did not require compensation at all.  (See also *Mugler v. Kansas* (1887) 123 U.S. 623, 668-669 [police power regulation of use of property is not a taking requiring compensation, even if it destroys the property's value].)

Instead, we read the two prongs as conjunctive:  A public entity *can* require a utility to pay to relocate *some* of its equipment, *even if* it is acting in its proprietary capacity; however, it can require the utility to pay to relocate *all* of its equipment *only if* it is acting in its governmental capacity.  *Vermont Gas Systems, Inc. v. City of Burlington* (1971) 130 Vt. 75 [286 A.2d 275] similarly read these prongs as conjunctive:  "The purposes of the municipality could not support any claim for resort to the police power, *and* the infringement of the utility franchises was unquestionable." (*Id*. at p. 81, italics added.)  In closing, *Los Angeles* stated:  "[W]e are not concerned with the duty of the corporation operating a public utility to yield uncompensated obedience to a police measure adopted for the protection of the public, but with a proposed uncompensated taking or disturbance of what belongs to one lighting system in order to make way for another.  *And this the Fourteenth Amendment forbids*.  What the grant was at its inception it remained and was not subject to be displaced by some other system, even that of the city, without compensation to the corporation for the rights appropriated." (*City of Los*

*Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at p. 40, italics added.) We believe this is consistent with our reading of its holding.

The Gas Company disputes our reading. It claims that, particularly in light of the facts stated in district court's decision, *Los Angeles Gas & Electric Co. v. City of Los Angeles* (1917) 241 F. 912, the city was *not* trying to take the entire franchise. The Supreme Court acknowledged that challenged ordinance did not require "absolute displacement" of the utility's equipment; rather, the city "required the corporation to change or shift or lower its wires to the detriment of their efficient use . . . ." (*City of Los Angeles v. Los Angeles Gas & Electric Corp.*, *supra*, 251 U.S. at pp. 36-37.) It went on to say, however: "There is some conflict as to the extent and effect which, however, we are not called upon to reconcile. It was stipulated: [¶] 'That the value of the right to exercise the franchises . . . exceeded the sum of $3,000 and was in excess of $4,000.' [¶] And it was testified that if the city . . . proceeds as it has done in ordering the removal of poles and wires, it will cost the corporation between $50,000 and $60,000 . . . ." (*Id*. at p. 37.) In other words, nominally, the city was only requiring the utility to relocate its equipment; however, the cost of doing so vastly exceeded the value of the franchise, effectively resulting in a taking of the franchise. Accordingly, *Los Angeles* has repeatedly been cited as holding that a franchise is a property interest that cannot be taken without due process. (E.g., *Petition of Vermont Elec. Power Producers, Inc.* (1996) 165 Vt. 282, 289-290 [683 A.2d 716, 720].) Admittedly, under our reading, the governmental-proprietary distinction still has a role to play, albeit a minor one: A public

68

entity can make a utility pay to relocate its entire system only if the public entity is acting in a governmental capacity, because only then is it exercising its police power. However, even this aspect of both *New Orleans* and *Los Angeles* was undercut just three years later, when the Supreme Court held that an exercise of the police power *can* be a taking requiring compensation, if it "goes too far." (*Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 413, 415-416; see also *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1014, 1022-1026.)

In sum, then, the reasons underlying the governmental-proprietary distinction in the utility relocation context are no longer valid. Cessante ratione legis, cessat et ipsa lex.

Rather, we concur with *Northeast*, *supra*, that "'[w]hatever local government is authorized to do constitutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur.'" (*Northeast Sacramento etc. Dist. v. Northridge Park etc. Dist.*, *supra*, 247 Cal.App.2d at p. 325.) In particular, here, the Commission is a governmental entity with the authority to acquire, construct, maintain, and operate public transit systems. It necessarily follows that, when it demanded that the Gas Company relocate its pipeline to make way for an extension of its existing rail line, it had a proper governmental purpose.

F.      *Alternative Tests of a "Proper Governmental Purpose."*

The Gas Company contends that, even if the governmental-proprietary distinction is not controlling, it is entitled to prevail under one of several alternative tests.

69

It raises two distinct arguments, although both are based on *Contra Costa County v. Central Contra Costa Sanitary Dist.* (1960) 182 Cal.App.2d 176. There, a flood control district sought to deepen a creek, which required the relocation of both a county's bridge and a sanitary district's sewer line. (*Id*. at p. 177.) The county paid to relocate both, then sought reimbursement from the sanitary district. (*Id*. at pp. 177-178.)

The court held that the common law rule did not apply, because both parties were public entities; the sanitary district was not a privately owned public utility operating under a franchise. (*Contra Costa County v. Central Contra Costa Sanitary Dist.*, *supra*, 182 Cal.App.2d at p. 179.) Rather, it held that the flood control district had to pay for the relocation under a "first in time, first in right" rule: "[T]he sanitary district's right and easement to use [the creek] for its sewer line was prior in time to the rights of the two other public bodies and therefore prior in right." (*Id*. at p. 178.)

It concluded by stating: "'The cost of relocation should not be borne by the taxpayers of the County generally nor by the taxpayers of the Sanitary District, but rather by the people resident within the Flood Control zone benefited by the improvement.'" (*Contra Costa County v. Central Contra Costa Sanitary Dist.*, *supra*, 182 Cal.App.2d at pp. 179-180.)

The Gas Company asks us to apply the "first in time, first in right" rule here. However, as *Contra Costa* indicated, this rule applies only in a dispute between two public entities; in a dispute between a public entity and a privately owned public utility, the common law rule applies. (See also *County of Orange v. Santa Margarita Water*

70

*Dist.* (1996) 44 Cal.App.4th 189, 191 ["The common law rule . . . does not apply in disputes, as here, between public agencies."], 193.)

Next, it asks us to apply a "benefits" test; under this test, the Commission, whose passengers will benefit from the relocation, should pay for it. In a law review article, Professor Arvo Van Alstyne acknowledged that *Contra Costa*'s statement suggesting a "benefit" test was "dictum"; he mused, however, that it "indicates the basis for an equitable solution." (Van Alstyne, *Governmental Tort Liability: A Public Policy Prospectus* (1963) 10 UCLA L.Rev. 463, 502.) "No relocation expense would have been incurred at all had it not been for the new improvement being constructed by the Flood Control District for the benefit of its residents. The most equitable way to distribute the loss is thus to require the Flood Control District to assume it, thereby passing it on to its taxpayers who are the beneficiaries of the loss-producing activity." (*Ibid*.) He added, "An equivalent result would seem to be justified as to private franchise occupiers as well. Where public agencies are the improvers whose activities make the relocation work necessary, the policy would lead to liability for the costs thereof . . . ." (*Ibid*.)

*Northeast Sacramento Co. Sant. Dist. v. Northridge Park Co. Wtr. Dist.*, *supra*, 247 Cal.App.2d 317 did adopt and apply *Contra Costa*'s "benefits" test. (*Northeast Sacramento*, *supra*, at pp. 321-322.) However, like *Contra Costa* itself, *Northeast Sacramento* was a conflict between two public entities, so the common law rule did not apply there, either. (*Id*. at p. 323.)

71

*Pacific Gas & Electric Co. v. Dame Construction Co.* (1987) 191 Cal.App.3d 233 also applied the "benefits" test. (*Id*. at p. 239.) There, however, the court held that the common law rule did not apply because the case was a conflict between two *private* entities. (*Id*. at pp. 236-238.)

The Gas Company cites *Reclamation Dist. No. 2042 v. Pacific Gas & Elec. Co.* (Cal. P.U.C., July 12, 2001) Dec. No. 01-07-010, 2001 Cal. PUC LEXIS 570. There, a reclamation district widened its levees, which required a private electric company to relocate its lines. (*Id*. at p. *2.) The district asked the PUC to apply the common law rule, citing *Livermore v. Pacific Gas & Electric Co.*, *supra*, 51 Cal.App.4th 1410. The PUC declined to do so, reasoning that "[the utility's] facilities were not installed under a franchise agreement with a city, as in *Livermore*." (*Reclamation Dist. No. 2042 v. Pacific Gas & Elec. Co.*, *supra*, at p. *17.) Instead, it followed the "benefits" test, citing *Contra Costa,* Professor Van Alstyne, and its own previous opinion in *Sunrise Oasis Estates v. So. Cal. Gas Co.* (Cal. P.U.C., Jan. 24, 1978, Dec. No. 88398) 1978 Cal. PUC LEXIS 597. (*Reclamation Dist. No. 2042 v. Pacific Gas & Elec. Co.*, *supra*, at pp. *18-*21.) *Reclamation* is obviously distinguishable — here, the Gas Company *did* install its facilities pursuant to a franchise, so the common law rule applies full-force.

And in *Sunrise*, on which *Reclamation* relied, a city required a private developer to make street improvements, which in turn required a gas utility to relocate its lines. (*Sunrise Oasis Estates v. So. Cal. Gas Co.*, supra, at p. *1.) The PUC refused to view the matter as if the City itself had required the utility to relocate its lines. (*Id*. at pp. *5, *7-

72

*8.)  In other words, it treated it as a dispute between two private parties.  It therefore imposed the relocation costs on the developer.  (*Id*. at pp. *7-*8.)  This is perfectly consistent with the holding of *Pacific Gas & Electric Co. v. Dame Construction Co.*, *supra*, that the common law rule does not apply as between two private parties.[23]

In sum, in a dispute like this one, between a public entity and a private utility, the proposed "benefits" test is not supported by any precedential authority.  We are not aware of a single case since Professor Van Alstyne made this suggestion that has adopted it on these facts.  As Professor Van Alstyne conceded, it would abrogate the common law "utility pays" rule in favor of a "public entity pays" rule.  The California Supreme Court has adopted the common law rule (*Los Angeles County F.C. Dist. v. Southern Cal. Ed. Co.*, *supra*, 51 Cal.2d at p. 334; *Southern California Gas Co. v. City of Los Angeles*, *supra*, 50 Cal.2d at pp. 716-717); we are not free to adopt a different one.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

IX

CATEGORICAL CONTENTIONS

Both sides make sweeping contentions as to why they should prevail on all causes of action, without regard to either the common law rule or the Licenses.  We address these seriatim.

---

[23]     If only out of an excess of caution, however, we note that PUC decisions on questions of law are not binding on us and not necessarily even persuasive.  (*Motor Transit Co. v. Railroad Commission of California* (1922) 189 Cal. 573, 586; *Pacific Gas & Electric Co. v. Dame Construction Co.* (1987) 191 Cal.App.3d 233, 241.)

A.      *Municipal Franchises Trump Railroad Property Rights.*

The Gas Company asserts that a municipality's rights in its streets have priority — categorically — over a railroad's property rights.

It cites, among other cases, *Bello*.  As we have discussed, however (see part VII.B.3), *Bello* calls for a flexible, fact-specific analysis of the three *Bello* criteria, which include whether the use allowed by the municipality unduly endangers or interferes with use of the landowner's property.  It does not support a categorical rule.

The Gas Company also cites *City of San Jose v. Union Pacific Railroad Co.*, *supra*, 185 Cal.App.4th 624, *Atchison, Topeka & S.F.R. Co. v. Public Util. Com.* (1953) 346 U.S. 346, and *Erie R. Co. v. Board of Public Utility Comm'rs* (1921) 254 U.S. 394.  These cases, however, boil down to little more than the common law rule:  A public entity (such as a municipality) can make a utility (such as a railroad) relocate at its own expense.  To that extent, as already noted, the municipality's use of the streets is "paramount," whereas the railroad's use is "subordinate."  (See fn. 18, *ante*.)  Here, however, the municipalities are not trying to make the Commission relocate its railway.  Rather, the relevant public entity is the Commission; the relevant public utility is the Gas Company.  Thus, as we held in part VIII, *ante*, the Commission can make the Gas Company relocate at its own expense.

And finally, as we have also already discussed, in part VII.B.2, *ante*, the Gas Company compromised whatever rights the municipalities had given it under the Franchises by entering into the Licenses.

74

B.      *Railroad Property Rights Trump Municipal Franchises*.

Amici, on the other hand, assert that a railroad's property rights have priority —

categorically — over a municipality's rights in its streets.  They point out that railroads

are subject to regulation by the PUC and are also subject to extensive federal regulation.

They conclude:  "To ensure:  (i) compliance with state and federal regulations; and (ii)

the safe operation of their trains; and (iii) to fulfill public transportation agencies' own

broad statutory authority to 'carry out the purposes' of public transportation, railroads

need primary, if not exclusive, control of the use of their rights of way."

At oral argument, amici put this argument even more strongly.  They argued that it

is not only customary but crucial to require a utility that crosses a railway to negotiate a

license.  This is because a license can provide protocols for rights of entry, allocate

liability, and ensure compliance with engineering and safety standards.  They warned

that, under our holding, utilities will terminate their licenses and repudiate such

provisions.

Looking backward, however amici do not point to any particular regulation that

was violated or any safety threat that was posed by the presence of the Gas Company's

pipelines.  At the five conflict points, the cities' street rights-of-way, the Gas Company's

pipelines, and Santa Fe's railroad all coexisted peacefully for decades.  That was true

even at the San Jacinto conflict point, for which the Gas Company did not have a license.

Looking forward, as noted in part VII.B.1, *ante*, *Bello* will not allow the placement

of a pipeline in a street right-of-way across private property if there is "any significant

75

risk of danger or interference with use of [the railroad] property." (*Bello v. ABA Energy Corp.*, *supra*, 121 Cal.App.4th at p. 317.) A utility that terminates its license and stops complying with the license terms does so at its peril. The railroad may immediately seek to eject it, on the ground that, by having its workers enter the railroad's property without permission, by exposing the railroad to liability, or by failing to comply with safety and engineering standards, the utility is interfering with its property rights. In our view, *Bello*'s "flexible approach" can accommodate a landowner's concerns, not just about using its property, but about using it safely and lawfully. Hence, as we already observed in part VII.B.2.c, *ante*, a utility and a railroad still have incentives to enter into a license.

In any event, we know of no legal authority for the categorical priority that amici propose. In the absence of any apparent necessity for it, we decline to create it.

C.      *The "Subject To" Language in the Deeds*.

The Gas Company contends that Commission's property rights (under the Purchase Agreement and the Deeds) were expressly subject to the Gas Company's property rights (under the Franchises).

The Purchase Agreement provided that "Santa Fe shall convey title to the Owned Properties" — defined as including the Property — "subject to" "all applicable laws . . . ." The Deeds similarly provided that Santa Fe conveyed its "right, title and interest" in "the land" "subject . . . to" "all applicable laws . . . ."

The Gas Company argues that "applicable laws" includes the Franchises. It further argues that, under the Franchises, it had to relocate at its own expense only under

76

the conditions set forth in the Franchises — in other words, only when the relocation was "made necessary by any lawful change of grade, alignment or width of any public street . . . ." As that was not the case here, it concludes that its property rights under the Franchises were superior to the Commission's property rights under the Deeds.

We may assume, for the sake of argument, that the Commission's *property* rights are subject to the Franchises. However, nothing in the Purchase Agreement or in the Deeds made the *Licenses* subject to the Franchises. The Commission's rights under the Licenses were neither "land" nor real property.

On this point, the trial court correctly stated: "The fact that [the Commission] took title subject to the [F]ranchises does not vitiate or abrogate the [L]icenses themselves. The fact that [the] Gas Company had a [F]ranchise also does not abrogate or vitiate the fact that they did enter into these license agreements." "The rights provided under the [L]icenses are separate from the franchise property rights."

The Commission's rights under the common law rule likewise were not subject to the Franchises. In this respect, the Gas Company's argument is circular. By taking title "subject to" existing municipal ordinances, the Commission was, at most, acknowledging that the Franchises existed and were enforceable according to their terms. The Franchises themselves, however, were subject to the common law rule. The Deeds cannot reasonably be construed as surrendering the Commission's rights under the common law rule. It held those rights by virtue of its status as a governmental entity, not by virtue of the Deeds.

77

Thus, the "subject to" language does not alter our conclusion that the Licenses superseded the Gas Company's rights under the Franchises. (See part VII.B.4, *ante*.) It likewise does not alter our conclusion that, under the common law rule, the Commission could require the Gas Company to relocate its pipelines at its own expense. (See part VIII, *ante*.)

D.     *Sovereign Immunity*.

Amici contend that the Commission, as an arm of the state, has sovereign immunity to the Franchises. The Gas Company protests that it is improper to raise this issue for the first time in an amicus brief. We agree.

"Amicus briefs generally must be confined to the *issues raised by the appealing parties*. Issues raised for the first time by amici curiae ordinarily will not be considered. [Citations.]" (Eisenberg, et al., Cal Practice Guide: Civil Appeals and Writs (The Rutter Group 2019) ¶ 9:210.1, p. 9-61.)

Significantly, this is not an issue of sovereign immunity to *suit*. That kind of sovereign immunity goes to the jurisdiction of the court. (*Gates v. Superior Court* (1995) 32 Cal.App.4th 481, 509-510.) Rather, this is an issue of sovereign immunity to *municipal regulation*. (See generally *Hall v. City of Taft* (1956) 47 Cal.2d 177, 183-184; *Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc.* (1996) 43 Cal.App.4th 630, 635.) We see no need to address it when the Commission — the assertedly sovereign entity — has not bothered to raise it.

# X

## DISPOSITION

The order summarily adjudicating the Commission's trespass cause of action is reversed; in all other respects, the orders on the cross-motions for summary adjudication are affirmed. The judgment is reversed, and the matter is remanded for further proceedings on the trespass cause of action. The Commission is awarded costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ\
               P. J.

I concur:

CODRINGTON\
       J.

RAPHAEL, J., Concurring and Dissenting.

Southern California Gas Company must pay the cost of moving its five subterranean lines that were in the way of the government's expansion of the Metrolink rail system with a route from the City of Riverside to the City of Perris.

That is the answer to this appeal's primary issue, which I view as an easier question than the majority opinion makes it out to be. In California, if the public allows a utility access to its streets for a line, the law requires that the utility pay to remove or relocate that line if a government agency requests it do so for a governmental purpose. The Legislature may authorize an exception to this rule, but it has not done so here.

I write separately because I believe that we would do well to make the statement of the above law clear, which our Supreme Court did in two cases decided in 1958. I also respectfully differ with the majority in that I believe the Riverside County Transportation Commission (Commission) should be permitted to pursue a trespass cause of action based on the Gas Company's failure to promptly remove all five lines (not merely four lines, as the majority holds). However, I disagree with the majority's view that the Commission should be able to pursue trespass claims based on the placement of lines at new locations. The Commission has not raised a claim that sounds in tort as it would by disputing the physical placement of the new lines, but rather it raises the regulatory claim that the Gas Company must accept a license for the locations. Finally, I disagree with the majority's view that *Bello v. ABA Energy Co.* (2004) 121 Cal.App.4th 301 (*Bello*) entitles

1

a private utility to place lines on public land; rather, it allows the utility to place them on private land with a publicly granted permit.

I

REIMBURSEMENT

A. *The Common Law Rule Governs*

"Under the traditional common law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities." (*Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Virginia* (1983) 464 U.S. 30, 35.)

This common law rule has applied in full force in California. A pair of 1958 opinions from our Supreme Court epitomizes this and binds us today. In those cases, the Supreme Court held that utilities must pay to relocate lines to make way for sewers or storm drains. (*Southern California Gas Co. v. City of Los Angeles* (1958) 50 Cal.2d 713, 716 (*Southern California Gas*) [sewers]; *Los Angeles County Flood Control District v. Southern Cal. Edison Co.* (1958) 51 Cal.2d 331, 334 (*Flood Control District*) [storm drains].)

The court stated that the common law rule applies "[i]n the absence of a provision to the contrary." (*Southern California Gas*, *supra*, 50 Cal.2d at p. 716; accord *Flood Control District*, *supra*, 51 Cal.2d at p. 334.) That is, the rule governs even if the Legislature is silent; a utility accepts "its franchise rights in public streets subject to

2

implied obligations to relocate its facilities at its own expense when necessary to make way for proper governmental uses of the street." (*Flood Control District*, at p. 336.)

Importantly, the Legislature codified the common law rule in 1937 when it enacted Public Utility Code section 6297 (section 6297). At that time, a utility perhaps could have argued that the language used in section 6297 restricted the common law rule to that section's terms. But our Supreme Court rejected that view and held that section 6297 did not circumscribe the common law rule. (*Flood Control District*, *supra*, 51 Cal.2d at pp. 338-339 [§ 6297 is the "partial expression[]" of the common law rule and its terms should be looked at "by way of example"].) Two dimensions to the 1958 Supreme Court opinions make this especially clear.

First, section 6297 states that the utility must relocate without expense to the "municipality." But in *Flood Control District*, *supra*, 51 Cal.2d 331 the Supreme Court applied the rule to a request by a *county's* flood control district, illustrating that the common law rule was not limited to only municipalities. Later, in 1971, the Legislature itself made clear that "municipality includes counties" in the statute. (Pub. Util. Code, § 6201.5.)

Second, section 6297 provides examples of government works that trigger the rule, including such things as subways and viaducts. But in *Southern California Gas*, *supra*, 50 Cal.2d 713 and *Flood Control District*, the Supreme Court applied the rule to unlisted projects involving sewers and storm drains. Thus, the examples in section 6297 do not limit the common law rule. The court further rejected the claim that the primary

3

purpose of the government action must be to service the street.  (*Flood Control District*, *supra*, 51 Cal.2d at p. 335 [discussing both cases].)

Under *Southern California Gas*, *supra*, 50 Cal.2d 713 and and *Flood Control District*, then, the default rule in California is the broad common law one:  a utility must pay for the relocation of its line if an agency requests as much for a governmental purpose.  The Legislature can act to reverse this rule and require an agency to pay.  For this reason, the Supreme Court in *Flood Control District* examined whether the Legislature had authorized relocation payments by the government agency there, though the court concluded that it had not.  (*Flood Control District*, *supra*, 51 Cal.2d at pp. 336-337.)  In a more recent case, the Court of Appeal held that the Legislature *had* done so in a statute directed at a metropolitan transit authority, so the entity had to pay a utility's relocation costs.  (*Pasadena Metro Blue Line Constr. Auth. v. Pac. Bell Tel. Co.* (2006) 140 Cal. App.4th 658, 664 (*Pasadena Metro*).)

This, then, is the simple analysis that we must apply:  the common law rule governs unless the Legislature declares otherwise.  (See *Pasadena Metro*, *supra*, 140 Cal.App.4th at p. 664 ["The Legislature may grant a utility the right to compensation for relocating its facilities, but must do so specifically"]; *City of Livermore v. Pacific Gas & Elec. Co.* (1997) 51 Cal.App.4th 1410, 1414 [utility compensated only when "specifically articulated by the Legislature"].)

Here, the Legislature has not required the Commission to absorb utility relocation costs.  Therefore, the common law rule applies, and the Gas Company must pay those

4

costs. The fact that licenses at four of the five locations also required the Gas Company to pay is simply an additional, nonessential reason to apply the common law rule. It is not clear that a license could supplant a legislative decision to compensate a utility, but we do not face such a conflict here, as there has been no such legislative decision. The Gas Company must reimburse the Commission.

B. *The Governmental/Proprietary Distinction*

The Gas Company has one reimbursement argument that is not foreclosed by *Southern California Gas*, *supra*, 50 Cal.2d 713 and *Flood Control District*, *supra*, 51 Cal.2d 331 and that is its claim that the Commission acted in a "proprietary" and not "governmental" manner in constructing the Metrolink extension. Proprietary actions fall outside the common law rule. In my view, the Commission acted in a governmental manner when it expanded the Metrolink system.

The Gas Company relies on a case, nearly a century old, holding that a municipality acted in a proprietary manner when it operated a railway on its city streets. As I will discuss, however, this case is inapplicable here. At the time *Postal Telegraph-Cable Co. v. City and County of San Francisco* (1921) 53 Cal.App. 188 (*Postal Telegraph-Cable*) was decided, at issue was whether the municipality had been given the *power* from the state to operate the railway. We have no such issue in this case, as the Commission was created by the state with the authority to operate the Metrolink.

The "municipal power" basis for the governmental/proprietary distinction arose because originally only the state, not its cities, had constitutional authority. Under

5

California's 1849 Constitution, cities were "subordinate subdivisions" of the state government whose powers could be wholly regulated by the Legislature. (*City of San Francisco v. Canavan* (1872) 42 Cal. 541, 557-558.) Consequently, in the state's first years, our Supreme Court drew the governmental/proprietary distinction based on whether the state had granted power to a municipality: "although a Municipal Corporation has delegated to it certain powers of government, it is only in reference to those delegated powers that it will be regarded as a government. In reference to all other of its transactions . . . it must be looked upon and treated as a private person." (*Touchard v. Touchard* (1855) 5 Cal. 306, 307.)

The 1879 Constitution "continue[d] to subordinate charter city legislation to general state laws." (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 395.) For example, municipalities "unless specially authorized by charter, were without power to make or operate the several public utilities . . . ." (*In re Application of Russell* (1912) 163 Cal. 668, 672, *revd. on other grounds*, *Russell v. Sebastian* (1914) 233 U.S. 195.) Thus, in the early Twentieth Century, our Supreme Court continued to base the governmental/proprietary distinction on whether a municipality had been granted power by the state. The court stated that a municipality exercises "governmental functions" when acting "as an agent of the sovereign power," that is, "when acting in its governmental, political, or public capacity as an instrumentality intrusted by the state with the subordinate control of some public affair." (*Davoust v. City of Alameda* (1906) 149 Cal. 69, 70.) The court cited the leading turn-of-the-century municipal law treatise

6

as defining an action as "'governmental'" where the municipality "'is made, by the state, one of its instruments, or the local depositary of certain limited and prescribed political powers, to be exercised for the public good on behalf of the state rather than for itself'" and proprietary as where powers are not "'from considerations connected with the government of the state at large, but for the private advantage of the compact community.'" (*Id.* at p. 72.)

With this legal backdrop, the court decided *Postal Telegraph-Cable*. That case is founded on a municipality's lack of power. In *Postal Telegraph-Cable*, it was not even contended "that the city, in the exercise of its police power" had the ability to construct or operate a municipal railway system. (*Postal Telegraph-Cable*, *supra*, 53 Cal.App. at p. 193.) It was accepted that it lacked such power. The opinion relied on a Supreme Court case, *Vale v. Boyle* (1918) 179 Cal. 180 (*Vale*), that had determined such an action was proprietary. (*Postal Telegraph-Cable*, at p. 190). In *Vale*, the Supreme Court had done so based on its "construction of the charter of the City and County of San Francisco." (*Vale*, *supra*, at p. 181.) This reasoning was not based on a view that operating a railway *could not* be a governmental action, only that it was not authorized by the municipal charter at issue in the case. The reasoning suggests that such an action would be governmental if the *state* authorized it. At a minimum, the reasoning does not suggest any limit on what action is within the state's governmental power, as opposed to within a municipality's power under its charter.

7

We need go no further to distinguish *Postal Telegraph-Cable*.  The Commission—unlike a 1921 charter city lacking the state-given power to run a railway—was created by the state for a purpose that plainly includes constructing and operating the Metrolink railway.  In the 1976 County Transportation Commissions Act, our Legislature found a need for an "efficient public transportation system in the Southern California region" for an assortment of economic, public service, and environmental reasons.  (Pub. Util. Code, § 130001, subd. (a).)  The state therefore created the Commission, and commissions in several other Southern California counties.  (Id., §§ 130050, 130050.1.)  Metrolink today operates hundreds of miles of commuter rail through a board representing those state created commissions.  The Riverside to Perris rail extension here falls squarely within the authority of a state created governmental entity, even if, a century ago, a charter city went outside of its delegated power when it operated a municipal rail system.

With *Postal Telegraph-Cable*, *supra*, 53 Cal.App. 188 understood as founded upon the limited power granted to a charter city around 1920, our Supreme Court's 1958 cases compel the conclusion that the state's creation of a transportation commission makes that commission's exercise of its powers governmental.  Just as the state created Los Angeles County's flood control district to achieve a public purpose (see *Flood Control District*, *supra*, 51 Cal.2d 331), so did it construct the Commission for such a goal, albeit a different one.  (Compare West's Annotated Water Code Appendix 28-2 [Legislature created the flood control district as a "body corporate and politic"] with Pub.

8

Util. Code, §§ 130200-130203 [creating corporate powers of county transportation commissions].)

It is reasonable to consider if there exists a modern basis for the governmental/proprietary distinction—other than the historical one that turns on whether the government entity has state-granted governmental power to act—that could distinguish the Metrolink from sewers and storm drains in the 1958 cases. In post argument briefing, the Gas Company relies on eminent domain cases that it claims establish that projects essential to public safety and health (such as sewers and storm drains) require no compensation to a private party, while other projects (such as railroads) require compensation. I am not persuaded. Whatever the merits of this distinction in an eminent domain case, utilities accept their franchise right to use the public streets in return for an implied obligation to move them for a governmental purpose. In that situation, it does not make sense to apply standards for a constitutional "taking" that apply where a property owner has assumed no such obligation. (*Pacific Tel. & Tel. Co. v. Redevelopment Agency* (1977) 75 Cal.App.3d 957, 964.) Indeed, the Gas Company's property is its franchise, and that remains undamaged by the Metrolink expansion; it has not been taken. In addition to its eminent domain argument, the Gas Company makes economic and policy arguments that are better suited for a legislative determination as to whether to exclude Metrolink projects from the common law rule.

Rather than simply distinguishing *Postal Telegraph-Cable*, *supra*, 53 Cal.App. 188 the majority scythes a wider path through the caselaw. It engages in a lengthy

9

analysis and concludes that the governmental/proprietary distinction is "no longer valid." (Maj. opn., *ante*, at pp. 53-69). Bewilderingly, in almost the same breath, the majority also finds that the distinction still has a "minor" role to play. (Maj. opn., *ante*, at p. 69.) The majority observes the doctrine receding, like the sea in Matthew Arnold's poem "Dover Beach." (Maj. opn., *ante*, at p. 60.) This poetic waning is among the factors prompting the majority to reject the doctrine outright. But as Arnold's contemporary on this side of the pond cautioned, "Each thing in its place is best." (H.W. Longfellow (1850) "The Builders.") Our Supreme Court applied the governmental/proprietary doctrine in the context of utility lines in the pair of 1958 cases discussed in the previous section. (*Southern California Gas*, *supra*, 50 Cal.2d at pp. 717-718; *Flood Control District*, *supra*, 51 Cal.2d at p. 334.) It has not since addressed the distinction in the context of utility line removal. It has continued to apply the distinction in municipal law contexts. (See, e.g., *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 18.) Indeed, the court has never repudiated the doctrine in municipal law, and it declined a chance to do so just last year. (See *City and County of San Francisco v. Regents of University* (2019) 7 Cal.5th 536, 553, fn. 5 [dispute as to whether municipal operation of paid parking lots was governmental or proprietary].) It is not our place to hold the distinction invalid.

If this case involved a municipality, we might need to address the scope of the governmental/proprietary distinction. On the one hand, municipal powers are more robust than when the governmental/proprietary distinction developed in the Nineteenth

10

Century. Several constitutional amendments, most recently one in 1970 addressing the "home rule" powers of charter cities, mean that California municipalities now wield more authority, independent of the state, than when the municipal law governmental/proprietary distinction developed. (*Johnson v. Bradley*, *supra*, 4 Cal.4th at pp. 396-397.) Our Constitution now expressly authorizes municipalities to establish and operate certain utilities, including "transportation." (Cal. Const., art. XI, § 9.) But, on the other hand, while our charter cities now have independent constitutional powers, those powers stop at the point where a municipal enactment conflicts with a state statute on a matter of statewide concern. (See Cal. Const., art. XI, § 5; *Johnson v. Bradley*, at pp. 399-400.) Our Constitution in fact restricts municipal power over utilities in that cities and counties "may not regulate matters over which the Legislature grants regulatory power to the [Public Utilities] Commission." (Cal. Const., art. XII, § 8.)

But we need not decide in what ways (if any) municipalities might still act outside their governmental authority. This case is about a county transportation commission's construction of a commuter rail line. The state Legislature created the Commission for such a purpose. Its action in expanding the Metrolink from Riverside to Perris was governmental, just as the action of the county entity in *Flood Control District*, *supra*, 51 Cal.2d 331 was governmental. (The Gas Company does not argue that the authority to expand the Metrolink is trumped by the Public Utilities Commission.) Because the Commission engaged in a governmental action by extending the Metrolink commuter rail system, it may require the Gas Company to pay for the relocation of its lines under the

11

common law.  The Legislature has not limited the common law rule in the 62 years since our Supreme Court emphasized its robust interpretation of it.  I would apply the common law in a straightforward manner.

## II

## TRESPASS

The Commission argues that the Gas Company committed a trespass under two distinct theories:  (1) that the Gas Company committed a trespass at each of the five locations when it failed to remove or relocate its lines after a reasonable time following the Commission's request to do so, and (2) that the Gas Company committed a trespass by relocating its lines to other locations that crossed the railroad corridor, without first obtaining a license from the Commission.

These theories, if colorable, would lead to damages distinct from the claim that the Gas Company must reimburse the Commission for removing its lines.  In other words, under the common law discussed in the previous section, the Gas Company must pay the cost of removing and relocating its lines *even if* it avoided any trespass by moving them promptly, and by accepting the license that the Commission wanted.  The trespass claims would lead to further damages for failing to remove or relocate the lines as required.

The majority remands for further proceedings on both theories, but, as to the first theory, as to only four of the five lines.  (Maj. opn., *ante*, at p. 47.)  In my view, the Gas Company could have committed a trespass at all five locations if it did not promptly remove its lines within a reasonable time after the Commission's request.  As discussed

12

earlier, the Gas Company was obliged to do so under the common law.  For this reason, I depart from the majority's decision to limit the trespass claim to only four of the five lines.  I would remand for proceedings as to all five lines on this theory of trespass.  (I do not know if there is a viable theory as to how the delay in moving those lines caused damages, but that issue is not before us.)

As to the second trespass theory, I do not find it viable as to any of the five lines. The Commission does not object to the physical placement of the lines, a matter on which the parties reached a settlement.  Rather, the Commission believes that the Gas Company must enter into a license, with terms (apparently) of the Commission's choosing.  The Gas Company believes no license is required, so the parties agreed that "whether there should be any license agreements, and the terms of any such agreements can be the subject of future litigation."

In my view, this question defines a regulatory issue and not one that sounds in tort. A civil trespass claim must be founded on some sort of physical intrusion or physical damage.  (*San Diego Gas & Elec. Co v. Superior Court* (1996) 13 Cal.4th 893, 936-937.) The Commission's claim here is that it can require a license and dictate that license's terms.  But a tort suit is not the way for a government agency to impose a license.  If the Commission has a winning argument, it is not as a tort plaintiff but as a regulatory petitioner:  by demonstrating that some law permits it to require a license, or some procedure permits it to go to another regulatory agency (or perhaps a court) and obtain an order imposing a license, permit, or public-protective terms upon the Gas Company.  I do

not see how the licensing determination could possibly be properly handed to a jury charged with determining tort liability, regardless of whether such a regulatory path for imposing a license is available.

Finally, I respectfully disagree with the majority's construction of *Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301 (*Bello*), as I do not think "*Bello* is fully applicable to this dispute." (Maj. opn., *ante*, at p. 44.) The majority concludes that *Bello* "entitled" the Gas Company to install lines over the railroad corridor without the Commission's permission solely because the Gas Company had franchises from municipalities. (*Id.* at p. 45.) It is not clear how the majority squares that view with its holding that the Commission can maintain a trespass cause of action based on the Gas Co.'s relocating its lines to the new locations. (*Id.* at p. 47.) And, in holding that *Bello* immunizes the Gas Company from trespass liability for the failure to promptly remove the line at the one location where it was not subject to a license, the majority does not explain why *Bello* trumps the common law relocation and reimbursement requirement. Regardless, I think *Bello* has no application as to trespass for either party.

*Bello* held that a private company that obtained a county permit for use of its road right-of-way did not trespass on a private landowner's underlying land when it installed a gas line pursuant to that permit, even though the installation was without the landowner's consent. The glaring difference between *Bello* and this case is that in *Bello* the only public interest was on the side of the gas company, which had received a county permit to lay the line so it could deliver gas to the public. This interest weighed in favor of

insulating the gas company from trespass as against a private owner of the land. Thus, *Bello* relied on a case from our Supreme Court recognizing that an "'owner of the fee must yield to the public use.'" (*Bello*, *supra*, 121 Cal.App.4th at pp. 310, 312 [quoting *Colegrove Water. Co. v. Hollywood* (1907) 151 Cal. 425, 430].)

Here, rather than a private landowner, we have a government entity, the Commission, which owns the railroad corridor on behalf of the State of California. The Commission is using the corridor for a public use. That is in fact why it has common law authority to require removal of gas lines for a governmental purpose. This is enough to distinguish *Bello*, as it makes no sense to hold that a government landowner must "'yield to the public use.'" Indeed, in *Bello*, the court recognized that, even with a county permit, there may be other necessary permits or permissions from other public agencies. (*Bello*, *supra*, 121 Cal.App.4th at pp. 312, 319.)

Although *Bello* does not entitle the Gas Company to lay its lines on Commission land without permission, that does not mean that it is liable in trespass for doing so. As discussed above, as this case comes to us, I think there can be no trespass from relocating the lines because there is no dispute about the physical placement of the lines. This differs from reaching that conclusion due to a *Bello* entitlement. On the other hand, I do not think *Bello* precludes trespass liability based on failure to timely move the five lines as required by the common law.

Based on the above views, I would hold that the Gas Company owes reimbursement under the common law, and that the Commission's trespass claims may

15

proceed to trial on only the theory that the Gas Company refused to move five of its lines

for an unreasonable time after it was requested to do so.

RAPHAEL

J.